IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34872-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED IN PART |
| | ) | |
| CHRISTOPHER B. RAMIREZ, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, A.C.J. — Christopher Ramirez appeals his convictions and sentence for two counts of premeditated first degree murder and one count of first degree unlawful possession of a firearm. We affirm.

## FACTS[1]

On November 1, 2014, at approximately 9:34 p.m., law enforcement received reports of gunfire from Spokane Valley's Broadway Square Apartments. When officers arrived at the scene, they connected the gunfire to apartment four of the complex, which had been occupied by brothers Arturo and Juan Gallegos. Juan Gallegos's deceased body was outside the apartment. He had sustained multiple gunshot wounds. Arturo Gallegos was discovered inside a bedroom to apartment four with a single, fatal gunshot wound to the head.

---

[1] The following facts are taken from the trial testimony.

The evidence indicated Arturo Gallegos had been shot while sitting inside his room, on top of his bed. There did not appear to have been a precipitating struggle or any sort of theft or ransacking of his room or apartment. Gunpowder stippling left on Arturo Gallegos's face indicated he had been shot at close range. A bloodstained hat and glove were located on the bed.

A further review of the scene suggested Juan Gallegos was shot and killed after Arturo Gallegos. Although Arturo Gallegos had been shot only once, his bedroom contained three shell casings. The door from Arturo Gallegos's bedroom into the apartment hallway was marked with two bullet holes. Door fibers surrounding the holes indicated the bullets had traveled from inside the bedroom into the hallway. No bullet fragments or markings were found in the hallway. Instead, the hallway wall was smeared with blood, which was later identified as belonging to Juan Gallegos. On the floor of the hallway were a pair of flip flops that had been discarded in an irregular fashion. Next to the flip flops was another blood stain from Juan Gallegos. Juan Gallegos's body was found outside the main door, in front of apartment three. He was barefoot and had suffered 11 gunshot wounds.

Officers theorized that Juan Gallegos was initially shot while attempting to open the door to his brother's bedroom after hearing the gunshot that killed Arturo Gallegos.

2

Once Juan Gallegos was shot through the door, he tried to escape down the apartment hallway, losing his flip flops along the way. Juan Gallegos was able to escape from the apartment, only to be shot and killed outside.

As part of the investigation, officers talked to residents of the Broadway Square Apartments. No one saw the shooting or an apparent assailant. However, one of the residents reported hearing something near the fence behind the apartment complex around the time of the shootings. A K-9 handler investigated the area and picked up a track that went south from the complex for about two blocks to an address on East Valleyway Avenue in Spokane Valley.

Once at the East Valleyway address, officers were approached by a man named Carlton Hritsco. Mr. Hritsco asked if the officers were looking for a "'Mexican guy.'" 3 Report of Proceedings (RP) (Oct. 6, 2016) at 476. Mr. Hritsco explained that he had been outside of his house and smoking a cigarette when he heard someone approach. The individual told Mr. Hritsco his name was "Demon." *Id*. at 514. The individual made Mr. Hritsco nervous, so Mr. Hritsco texted a friend, asking the friend to come over. The text went through at 9:41 p.m. Mr. Hritsco told law enforcement he felt certain he would be able to recognize the individual who had identified himself as Demon. A sheriff's deputy showed Mr. Hritsco photographs of five individuals from the Spokane area who were

3

known to use the moniker Demon. The photographs were pulled up, one-by-one, on the computer screen inside the deputy's vehicle. Although one of the five photographs depicted Christopher Ramirez, Mr. Hritsco was not able to make a positive identification. Mr. Hritsco did say that Demon had been using his cell phone during their interaction. He also added that Demon was looking for a ride and had asked for directions to the bus.

The morning after the murders, law enforcement contacted Arturo Gallegos's daughter, Rosemary Valerio, and her husband, Angel Valerio. Mr. Valerio identified Mr. Ramirez as someone who had problems with Arturo and Juan Gallegos.[2] Mr. Ramirez is Rosemary Valerio's cousin and the nephew of Arturo and Juan Gallegos. Mr. Valerio disclosed that on July 15, 2014, Mr. Ramirez had sent a text message to his uncles, Arturo and Juan, along with several others, that read, "'Tio.[3] We all die. Rest in peace. Fuck you all if that's how it is.'" 2 RP (Oct. 6, 2016) at 376. Mr. Ramirez had also previously acknowledged pulling out a knife on Arturo Gallegos. Mr. Valerio disclosed that Mr. Ramirez went by the nickname Demon.

---

[2] Mr. Valerio also indicated that a jealous husband could have been responsible for the murders, since Arturo Gallegos had numerous romantic encounters with "tweaker girls." 2 RP (Oct. 6, 2016) at 394-96.

[3] "Tio" is Spanish for "uncle."

Mr. Ramirez was arrested on November 2, 2014. Officers obtained a sample of Mr. Ramirez's DNA[4] and it was discovered Mr. Ramirez was the major contributor to DNA found on the interior portions of the bloodstained hat and glove found on Arturo Gallegos's bed. The blood was determined to have come from Arturo Gallegos. A search of Arturo Gallegos's cell phone revealed Mr. Ramirez had made plans to meet up with Arturo Gallegos on the evening of the murders. Telephone records also indicated Mr. Ramirez had placed a call at 9:59 p.m. on November 1 to the Spokane Transit Authority's bus schedule hotline.

After Mr. Ramirez's arrest, a sheriff's detective used Mr. Ramirez's booking photo to prepare a new photomontage to present to Mr. Hritsco. The montage contained six photos. Each photo was shown to Mr. Hritsco, one at a time. Mr. Hritsco again was unable to make an identification.

No firearm was ever recovered in connection with the murders of Arturo and Juan Gallegos.

PRETRIAL PROCEDURE

Mr. Ramirez was charged with two counts of premeditated first degree murder for the deaths of Arturo and Juan Gallegos, and one count of unlawful possession of a

---

[4] Deoxyribonucleic acid.

5

firearm. Mr. Ramirez's case was delayed for several months to allow for competency

evaluations. After he was deemed competent, Mr. Ramirez's trial was scheduled to start

on October 3, 2016.

Approximately two weeks before trial, Mr. Ramirez's attorneys filed a motion to

exclude Mr. Hritsco's testimony regarding the conversation he had with the man named

Demon. The motion claimed the State lacked sufficient evidence to connect Mr. Ramirez

with the man who spoke to Mr. Hritsco. Defense counsel argued that, given the lack of

connection, Demon's statements were not statements of a party opponent, but

inadmissible hearsay. The defense argued that testimony regarding Demon's statements

would be irrelevant, in violation of ER 401, and more prejudicial than probative in

violation of ER 403. The defense also claimed that introducing statements by an

unknown, out-of-court witness would violate Mr. Ramirez's constitutional right of

confrontation.[5] No other constitutional objections were raised regarding Mr. Hritsco's

testimony.

The defense also filed a motion to exclude a report and testimony from FBI[6]

Special Agent Jennifer Banks. The State had proffered Special Agent Banks as an expert

---

[5] U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.
[6] Federal Bureau of Investigation.

witness on historical cell site analysis. According to the report prepared by Special Agent

Banks, records obtained from Mr. Ramirez's cell phone provider placed him near the

Broadway Square Apartments 10 minutes before the first 911 call was placed on

November 1, 2014. The defense argued that Special Agent Banks's testimony should be

struck based on late disclosure and because it failed to meet both the *Frye*[7] standard for

admissibility and the criteria for expert testimony under ER 702.

Three days before trial, the State informed Mr. Ramirez's attorneys that it had

received additional information from Mr. Hritsco. During an interview on September 30,

2016, Mr. Hritsco disclosed that he had seen photographs of Mr. Ramirez in the media.

Based on those photos, Mr. Hritsco said he was absolutely sure Mr. Ramirez was the

individual he had talked to the night of the murders. Mr. Hritsco claimed the hair in the

photos shown to him by law enforcement had prevented him from previously making a

positive identification.

The parties argued the pending pretrial motions on the morning set for trial. The

defense continued to claim Mr. Hritsco's testimony should be excluded because the

individual named Demon who talked to Mr. Hritsco was an unknown hearsay declarant.

Apparently recognizing that the recent information obtained from Mr. Hritsco undercut

---

[7] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

this argument, the defense argued the most recent statement should "not be considered for purposes" of the pretrial motions hearing because the statement "wasn't submitted timely." 1 RP (Oct. 3, 2016) at 57. No constitutional concerns were raised regarding Mr. Hritsco's testimony. Nor did the defense question Mr. Hritsco's reliability. However, the defense noted that if Mr. Hritsco's most recent information had been disclosed at an earlier date, the defense would have "looked into an expert witness who could have testified about cross-racial identification as well as generally the ability of people to recall things better or worse over time." *Id.* at 65. Although the State indicated it would not object to a continuance, Mr. Ramirez's attorneys specifically refused to ask for more time. After taking the matter under advisement, the trial court ruled Mr. Hritsco's testimony admissible.

Prior to jury selection, the trial court also held a *Frye* hearing to determine the admissibility of Special Agent Banks's testimony. Special Agent Banks testified that she is part of the FBI's Cellular Analysis Survey Team (CAST). CAST members receive training in engineering and in deciphering cell phone records. Special Agent Banks described two components to her work. First, she interprets historic call detail records from cellular telephone providers in order to discern the location of cell towers activated by a particular voice call or text message. Second, Special Agent Banks performs field

8

tests of geographic areas to determine the strength of various cell towers. The field test involves driving through a location with a scanning device. The FBI's scanning device uploads cellular frequencies in a given area to a computer program, which plots signal strengths on an area map. Agent Banks testified that CAST agents had testified in approximately 400 courts throughout the country and that the CAST methodology is more widely accepted in the law enforcement community than any other cellular location method.

Defense counsel argued that Special Agent Banks's testimony should be struck because her expert report was untimely and because the FBI's mapping software had not been validated. The State made clear that it would not object to a continuance if Mr. Ramirez wanted more time to evaluate Agent Banks's report. However, Mr. Ramirez insisted on moving forward with trial as scheduled. The trial court ultimately permitted the State to go forward with Agent Banks's testimony, finding that the substance of the testimony was not novel.

TRIAL

The State's trial evidence was consistent with the above factual summary. During cross-examination of the State's witnesses, the defense elicited information indicating the Broadway Square Apartments was a hub for illegal activity. Over the State's objections,

the defense also procured testimony that drug paraphernalia was found in the Gallegoses'

apartment and that both brothers had methamphetamine in their systems at the time of

death.

Mr. Hristco testified at trial and identified Mr. Ramirez as the man who identified

himself as Demon the night of the murders. No objection was made to Mr. Hritsco's in-

court identification. The defense's examination of Mr. Hritsco was brief.[8] Mr. Hritsco

was not asked about his media exposure, the pretrial identification procedures used by

law enforcement, or the reliability of his in-court identification.

Testimony regarding the general nature of pretrial attempts to obtain

identifications from Mr. Hritsco was elicited from law enforcement. The direct testimony

and cross-examination was brief. No questions were raised regarding whether the law

enforcement procedures comported with standard policies or whether the procedures

raised concerns regarding eyewitness reliability.

During her testimony, Special Agent Banks explained how her CAST analysis

applied to Mr. Ramirez's case. According to Special Agent Banks, Mr. Ramirez's call

detail records included not only a code for each cell site antenna activated by Mr.

Ramirez's phone calls and texts, but also the 120-degree angle that the antenna had been

---

[8] Only 13 questions were posed to Mr. Hritsco on cross-examination.

pointed at the time of connection. By plotting the call detail data onto a map, Special

Agent Banks determined Mr. Ramirez's cell phone was in the area of the Broadway

Square Apartments at 9:24 p.m. on November 1, 2014. This was approximately 10

minutes before the first 911 calls. The call records also indicated the phone had moved

south of the Broadway Square Apartments by the time of Demon's interaction with Mr.

Hritsco.

In addition to interpreting the call detail records, Special Agent Banks explained

the field test she performed in connection to Mr. Ramirez's case. To perform the test,

Special Agent Banks drove through Spokane Valley, collecting cell tower frequencies

with an FBI scanner. The FBI's scanning software was then able to generate a map,

showing the coverage strength area for each of the cell towers activated by Mr. Ramirez's

cell phone. The maps developed from the drive-through process largely corroborated the

information indicated from the maps developed solely from the call detail records.

The defense called one witness during its case in chief. The witness was a resident

of the Broadway Square Apartments. The witness stated he knew an individual named

Maceo Williams, but he did not know Mr. Ramirez. Mr. Williams was one of the five

individuals with the alias "Demon" whose photographs had been shown to Mr. Hristco on

the night of the murders.

The jury found Mr. Ramirez guilty as charged. At sentencing, the State argued the sentences for the two murders with firearm enhancements were required to run consecutively under the serious violent offense provision of RCW 9.94A.589(1)(b). The trial court agreed it was "required" to impose consecutive sentences, 7 RP (Oct. 28, 2016) at 1231, and sentenced Mr. Ramirez to 608 months for count one and 380 months for count two, for a total of 988 months, with the unlawful possession of a firearm count running concurrently to the first two counts.

Mr. Ramirez appeals.

## ANALYSIS

*Errors associated with pretrial rulings*

### 1. Eyewitness identification

In his arguments on appeal, Mr. Ramirez claims Mr. Hritsco's identification testimony should have been excluded from trial. Unlike the basis for exclusion raised at trial, Mr. Ramirez now argues that Mr. Hritsco's identification testimony was patently unreliable. As such, Mr. Ramirez claims it should have been excluded under ER 403 and the federal and state constitutions.

#### a. ER 403

Under ER 403, a trial court may exclude relevant evidence if the prejudicial effect

12

substantially outweighs the probative value. During the trial court proceedings, Mr.

Ramirez's attorney argued Mr. Hritsco's testimony was more prejudicial than probative

because the State lacked evidence linking Mr. Ramirez to the individual who identified

himself as Demon to Mr. Hritsco on November 1, 2014. Defense counsel never argued

that Mr. Hritsco's testimony was more prejudicial than probative because his

identification of Mr. Ramirez was unreliable. In fact, counsel specifically asked the trial

court to disregard Mr. Hritsco's ability to identify Mr. Ramirez in assessing the

admissibility of his testimony. Because ER 403 is not a constitutional rule, defense

counsel's failure to preserve an objection to the reliability of Mr. Hritsco's testimony

precludes appellate review. RAP 2.5(a).

### b. *Federal constitutional safeguards*

The United States Constitution protects against the use of unreliable evidence, not

by prohibiting introduction of the evidence, but "'by affording the defendant means to

persuade the jury that the evidence should be discounted as unworthy of credit.'" *State v.

Allen*, 176 Wn.2d 611, 622, 294 P.3d 679 (2013) (quoting *Perry v. New Hampshire*, 565

U.S. 228, 237, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012)). Unreliable eyewitness

testimony is subject to exclusion under the federal constitution only if law enforcement

had a hand in causing the unreliability through use of unnecessarily suggestive

identification procedures. *Perry*, 565 U.S. at 238; *Manson v. Brathwaite*, 432 U.S. 98,

107, 109, 112-13, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). The federal standard requires

a trial court to find two things prior to excluding eyewitness testimony: (1) law

enforcement's pretrial identification procedure was unnecessarily suggestive, and (2) the

improper police procedure "created a substantial likelihood of irreparable

misidentification." *State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002).

As previously noted, Mr. Ramirez never argued at trial that Mr. Hritsco's

identification testimony was unreliable. He therefore failed to preserve an argument that

the State violated his federal constitutional rights introducing tainted eyewitness

testimony. Based on the lack of preservation, our review of Mr. Ramirez's arguments

turns on whether he can establish that introduction of Mr. Hritsco's identification

testimony amounted to a manifest constitutional error. RAP 2.5(a)(3).[9]

"RAP 2.5(a)(3) does not permit *all* asserted constitutional claims to be raised for

the first time on appeal, but only certain questions of 'manifest' constitutional

---

[9] The State contends the trial court did consider the reliability of Mr. Hritsco's identification testimony as part of the defense's motion to suppress. Br. of Resp't at 23. However, the portions of the record cited by the State do not support this representation. Nor does any other portion of the report of proceedings or clerk's papers. One might argue that the State has waived the issue of lack of error preservation. However, because Mr. Ramirez's failure to develop a factual record on this issue hinders meaningful review, we find RAP 2.5(a)(3) applicable.

magnitude." *State v. Kirkman*, 159 Wn.2d 918, 934, 155 P.3d 125 (2007). "It is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their actions or failure to object." *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009). "If the trial record is insufficient to determine the merits of the constitutional claim, the error is not manifest and review is not warranted." *Kirkman*, 159 Wn.2d at 935.

Mr. Ramirez claims the pretrial identification procedures used by law enforcement were suggestive, in violation of the federal due process clause, because Mr. Hritsco was repeatedly exposed to photos of Mr. Ramirez. Amicus from the Innocence Project add that the pretrial identification procedures were also improper because they were not administered in a double-blind fashion, i.e., the officer conducting the pretrial identification procedure was aware of the identity of the suspect or suspects. In support of their claims regarding suggestiveness, Mr. Ramirez and amicus point to empirical studies on memory and factors that can decrease reliability of eyewitness testimony. Amicus also refers to policies promulgated by the Washington Association of Sheriffs & Police Chiefs and the International Association of Chiefs of Police that recommend avoiding multiple identification procedures and nonblind administration.

The trial court was never privy to the empirical studies or law enforcement policies proffered by Mr. Ramirez and amicus. The State's witnesses were never asked about what policies governed their pretrial identification procedures. Nor was a record made regarding what steps may have been taken to protect against suggestiveness or misidentification. This lack of record precludes appellate review.

Because law enforcement was never questioned about their reasoning for engaging in two pretrial identification interviews and for not using a double-blind procedure, the record leaves unclear whether the procedures used by law enforcement were more suggestive than necessary under the circumstances. *Perry*, 565 U.S. at 238 (necessity can justify the use of suggestive identification procedures).

In addition, and perhaps more importantly, there are outstanding factual questions about whether the procedures used by law enforcement created a substantial likelihood that Mr. Hritsco would misidentify Mr. Ramirez. Mr. Hritsco has claimed that he was able to identify Mr. Ramirez as the man he knew as Demon not based on the police procedures, but because of press exposure. While it is possible that, after an evidentiary hearing, the trial court might have found Mr. Hritsco's testimony was influenced both by improper procedures and press exposure, this is far from a foregone conclusion. The fact that law enforcement utilized an identification procedure that was less than ideal does not

16

require suppression. *State v. Vaughn*, 101 Wn.2d 604, 610, 682 P.2d 878 (1984);

*Manson*, 432 U.S. at 112-13.  If an eyewitness's testimony is tainted not by improper law

enforcement procedures, but instead press exposure, suppression is not a proper remedy

under the federal due process clause.  *Perry*, 565 U.S. at 244.  Instead, a defendant's

recourse is vigorous cross-examination and other rights of trial procedure.  *Id*. at 232-33.

Under the current record, the trial court easily could have found that any problems with

Mr. Hritsco's reliability were caused by press exposure, not law enforcement techniques.

Such a finding would preclude relief under the federal constitution.

When it comes to the factual predicate for relief, the manifest error standard is

exacting.  The record must contain "nearly explicit" facts demonstrating a constitutional

violation.  *Kirkman*, 159 Wn.2d at 936.  Here, that requirement is not met.  It is far from

clear that the "trial court would have granted [a constitutional suppression] motion" had

one been filed.  *State v. McFarland*, 127 Wn.2d 322, 333-34, 899 P.2d 1251 (1995).

Accordingly, review of Mr. Ramirez's unpreserved federal constitutional claim is

inappropriate under RAP 2.5(a)(3).

> c. *Article I, Section 3 of the Washington Constitution*

Mr. Ramirez claims that even if he cannot establish Mr. Hritsco's testimony

violated his federal due process rights, the Washington Constitution provides additional

protections.  Mr. Ramirez cites no controlling authority for his state constitutional claim.

This lack of authority again poses an obstacle for review under RAP 2.5(a)(3)'s manifest

constitutional error standard.

The reason error preservation is important is that it gives the trial court the

opportunity to "prevent or cure the error" by either striking the testimony or issuing a

curative jury instruction.  *Kirkman*, 159 Wn.2d at 935.  Permitting retrial based on a

potentially strategic decision not to raise an objection in the trial court is "'wasteful of

the limited resources of prosecutors, public defenders and courts. '"  *McFarland*,

127 Wn.2d at 333 (quoting *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992)).

Appellate review under the manifest constitutional error standard is only appropriate for

"obvious" errors that could have been "foreseen" by the trial court.  *O'Hara*, 167 Wn.2d

at 99-100.

Here, it was neither obvious nor foreseeable that Mr. Hritsco's testimony should

have been excluded on independent state constitutional grounds.  The Washington

Supreme Court has repeatedly refused to recognize constitutional safeguards regarding

eyewitness testimony beyond those set by the federal constitution.  For example, in

*Vaughn*, 101 Wn.2d at 605, the Supreme Court ruled that where "there is no allegation

that impermissibly suggestive identification procedures were utilized, the due process

18

clause does not condition the admissibility of identification testimony upon proof of its reliability." Nine years before *Vaughn*, the court held that a problem with eyewitness testimony "affects only the weight of the testimony and not its admissibility." *State v. Gosby*, 85 Wn.2d 758, 760, 539 P.2d 680 (1975). *Gosby* refused to adopt a "'base line' of reliability below which evidence must not fall in order to be admitted." *Id*. Instead, the court held that a defendant's protections lie in the constitutional right to proof beyond a reasonable doubt and the test for sufficient evidence. *Id*. at 761.

Our Supreme Court has, admittedly, never engaged in a *Gunwall*[10] analysis to discern whether the Washington Constitution provides greater protections than the federal constitution in the eyewitness identification context. However, the trial court would have been pushing against a great weight of authority had it excluded Mr. Hritsco's testimony purely on state constitutional grounds. Indeed, we have previously held in an unpublished decision that the state constitution does not provide greater protection against unreliable eyewitness testimony than the federal constitution. *State v. Haff*, No. 70296-3-I, slip op. at 14-24 (Wash. Ct. App. Feb. 23, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/702963.pdf. Given the state of our case law, there is no basis for concluding that the trial court's failure to exclude Mr. Hritsco's

---

[10] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

identification testimony on state constitutional grounds was obvious error.  Review is

therefore unwarranted under RAP 2.5(a)(3).

It should be noted that the absence of a viable constitutional challenge to

unreliable eyewitness testimony does not leave a criminal defendant without recourse.

In *Vaughn*, the Supreme Court recognized that a patently unreliable identification can be

challenged under ER 602, which requires that testimony be within a witness's firsthand

knowledge.  101 Wn.2d at 611-12.  This approach is consistent with the analysis of the

Oregon Supreme Court in *State v. Lawson*, 352 Or. 724, 746-48, 291 P.3d 673 (2012),

which held that unreliable eyewitness testimony can be meaningfully challenged under

Oregon's evidentiary code without having to make an underlying showing of suggestive

police procedures.  But Mr. Ramirez never challenged the reliability of Mr. Hritsco's

testimony under the rules of evidence.  Accordingly, his evidentiary avenue for attacking

Mr. Hritsco's testimony was waived.[11]

---

[11] Had Mr. Hritsco's identification testimony been excluded, he still would have been able to testify and provide the jury with significant information.  Even without specifically identifying Mr. Ramirez as the individual he knew as Demon, Mr. Hritsco would have been able to describe his interactions with Demon on the night of November 1, 2014.  As recognized by the trial court, there was sufficient evidence apart from Mr. Hritsco's identification to connect Mr. Ramirez with Demon.  Thus, the statements would have still been admissible as admissions by a party opponent.  In addition much, if not all, of the statements made by Demon to Mr. Hritsco were not offered for the truth of the matter asserted.  Thus, they would not have been subject to exclusion as hearsay.

20

## 2. *FBI historical cell site analysis*

Mr. Ramirez argues the trial court erred when it found Special Agent Banks's cell site analysis admissible under *Frye* and ER 702. Mr. Ramirez's complaint is that the software program used by the FBI is proprietary, and thus has not been subject to independent peer review. He also claims Special Agent Banks's testimony was unhelpful to the jury because the FBI cell site location methodology fails to account for imperfections in the cell transmission process, such as weather, obstructions, and network traffic.

Washington uses the *Frye* standard for determining the admissibility of novel scientific evidence. *State v. Copeland*, 130 Wn.2d 244, 261, 922 P.2d 1304 (1996). The standard has two parts. It asks (1) whether the underlying theory is generally accepted in the scientific community, and (2) whether there are techniques utilizing the theory that are capable of producing reliable results. *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994). Evidence not involving "new methods of proof or new scientific principles" is not subject to examination under *Frye*. *State v. Baity*, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000). We review a trial court's *Frye* determination de novo. *Copeland*, 130 Wn.2d at 255-56.

If scientific testimony passes the *Frye* test, "the trial court must then determine whether the expert testimony should be admitted under the two-part test of ER 702." *Id*. Under ER 702, the admissibility of expert testimony turns on whether the witness qualifies as an expert and whether the expert's testimony would be helpful to the jury. A trial court's decision to admit testimony under ER 702 is reviewed for abuse of discretion. *State v. Kalakosky*, 121 Wn.2d 525, 541, 852 P.2d 1064 (1993).

With respect to the *Frye* standard, cell site location testimony is not novel; it is widely accepted throughout the country. Ryan W. Dumm, *The Admissibility of Cell Site Location Information in Washington Courts*, 36 Seattle U. L. Rev. 1473, 1501-02 (2013) ("With respect to reliability, a *Frye* inquiry is unnecessary."); *see also United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016) ("Historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood."); *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 61, 62 N.E.3d 1107, 407 Ill. Dec. 185; *Stevenson v. State*, 222 Md. App. 118, 134, 112 A.3d 959 (Md. Ct. Spec. App. 2015); *Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 n.5 (8th Cir. 2015); *Pullin v. State*, 272 Ga. 747, 749, 534 S.E.2d 69 (2000) (Historical cell site analysis technology "has reached a scientific stage of verifiable certainty to be admissible.").

22

While there is controversy over the ability of a cell site analyst to pinpoint the location of a cell phone at a given point in time, *Hill*, 818 F.3d at 298, that sort of testimony was not introduced in Mr. Ramirez's case. FBI Special Agent Banks was careful to explain that her testimony only provided information of the approximate area of Mr. Ramirez's cell phone. In addition, Agent Banks bolstered the reliability of her historical analysis by performing a drive-through analysis of the signal strength of the cell towers activated by Mr. Ramirez's cell phone and evaluating the "particular characteristics of the cell tower with which [Mr. Ramirez's] phone connected, [at 9:24 p.m.] including its power [and] the direction its antennae were facing." *Id*.

The fact that Special Agent Banks used proprietary software to map out cell tower strengths within Spokane Valley did not cause her testimony to fall outside of *Frye*. The theories behind the drive-through test/cell tower strength testimony were sound. It is not novel or uncommon to measure the strength of cell tower or radio frequencies. *See State v. Vermillion*, 112 Wn. App. 844, 862, 51 P.3d 188 (2002). In addition, computer programs routinely generate maps that correspond to real-world data. Dumm, 36 Seattle U. L. Rev. at 1494. While the FBI has not shared its proprietary software for external validation, the assumptions on which the software operated were transparent and readily capable of testing and replication. Mr. Ramirez was fully equipped to challenge the FBI's

computer program through cross-examination or by hiring a defense expert. *See*

*Copeland*, 130 Wn.2d at 271. Concerns about the FBI's software program did not

present a reason for excluding Special Agent Banks's testimony under *Frye*.

The trial court also did not abuse its discretion in admitting Special Agent Banks's

testimony under ER 702. It is undisputed that Agent Banks qualifies as an expert in

historical cell site analysis. Her testimony was also helpful to the jury. Agent Banks did

not overestimate the quality of her cell site analysis. Throughout her testimony, she made

the jury aware of the imprecision of cell site location information. *Hill*, 818 F.3d at 299.

She cross tested the information obtained from the cell location records with information

from her drive-through signal strength test. Mr. Ramirez cannot identify any realistic risk

that the jury would have been confused by the nature of this testimony. The evidence was

therefore properly admitted.

A majority of the panel having determined that only the foregoing portion of this

opinion will be printed in the Washington Appellate Reports and that the remainder

having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it

is so ordered.

### 3. Admission of the July 15, 2014, text message

Mr. Ramirez argues the trial court abused its discretion by admitting the July 15, 2014, text message as trial evidence. According to Mr. Ramirez, the text message was too remote in time to have any significant evidentiary value. He also contends the content of the text was confusing and could cause undue prejudice. Mr. Ramirez claims the text message should have been excluded under ER 404(b) and ER 403.

Reviewing the trial court's decision to admit the text message evidence for abuse of discretion, *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 1193 (2003), we find no error. There was no dispute that the July 15 text message had been sent by Mr. Rodriguez to his uncles. *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (first element of the ER 404(b) analysis is to discern whether the prior bad act occurred). Although the meaning of the message could be debatable, it was reasonable to interpret the message as a threat to kill. The existence of a prior threat was evidence of motive and was relevant to the State's burden of proving intent and premeditation. *Id*. (second and third elements of ER 404(b) analysis involve identifying the purpose of the prior act evidence and discerning whether it is relevant to prove the crime charged). The trial court offset any undue prejudice that might be caused when admitting the July 15 text message by allowing the defense to introduce subsequent messages, suggesting the relationship

25

between Mr. Ramirez and his uncles had been repaired. *Id.* (final component of the ER

404(b) analysis is to weigh probative value against prejudicial effect). There was,

therefore, no abuse of discretion in admitting the evidence.

*Alleged errors during trial*

### 1. Sufficiency of the evidence

Mr. Ramirez challenges the sufficiency of the State's evidence as to premeditation

(an element of the charge of first degree murder) and as to possession of a firearm (an

element of the charge of unlawful possession of a firearm).

When reviewing a sufficiency challenge, we review the trial evidence in the light

most favorable to the State and ask whether any rational trier of fact could have found the

defendant guilty beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829

P.2d 1068 (1992). All reasonable inferences from the evidence must be drawn in favor of

the State and interpreted most strongly against the defendant. *Id.* A claim of

insufficiency admits the truth of the State's evidence and all inferences that reasonably

can be drawn therefrom. *Id.*

### a. Premeditated intent

Premeditation, for purposes of first degree murder, is the deliberate formation of

and reflection on the intent to take a human life and involves the mental process of

26

thinking beforehand, deliberating on, or weighing the contemplated act for a period of time, however short. *State v. Allen*, 159 Wn.2d 1, 7-8, 147 P.3d 581 (2006); *State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (2008). Premeditation requires more than a moment in time. RCW 9A.32.020(1). Examples of evidence supporting a finding of premeditation include: motive, prior threats, multiple wounds inflicted or multiple shots, striking the victim from behind, generally the manner or method of killing, assault with numerous means or a weapon not readily available, and the planned presence of a weapon at the scene. *State v. Hoffman*, 116 Wn.2d 51, 83, 804 P.2d 577 (1991); *State v. Bingham*, 105 Wn.2d 820, 827, 719 P.2d 109 (1986); *Ra*, 144 Wn. App. at 703-04; *State v. Rehak*, 67 Wn. App. 157, 164, 834 P.2d 651 (1992).

With respect to Arturo Gallegos, the State presented a variety of evidence in support of premeditation. There was evidence of two prior threats, including not only the July 15 text but also the incident where Mr. Ramirez pulled a knife out on Arturo Gallegos. Call and text record evidence indicated Mr. Ramirez deliberately planned to go see Arturo Gallegos on the day of the murders. In addition, evidence from Arturo Gallegos's bedroom indicates Mr. Ramirez deliberately deployed a kill shot against Arturo Gallegos, without a precipitating fight or struggle. While much of the State's evidence might have been subject to interpretation, construing the evidence in the light

27

most favorable to the State, there was evidence Mr. Ramirez had long harbored a plan to kill his uncle and that he deliberately executed that plan on November 1, 2014.

As to Juan Gallegos, the State's evidence of premeditation was even stronger. Not only was there the threatening July 15 text message sent from Mr. Ramirez to both his uncles, but the evidence from the scene indicated Mr. Ramirez deliberately engaged in a plan to continue shooting Juan Gallegos until his uncle died. As previously noted, evidence from the scene suggested Mr. Ramirez twice shot Juan Gallegos through a closed door. As Juan Gallegos tried to escape down the hallway, Mr. Ramirez opened the door and continued shooting. The assault then continued through the apartment and out to the exterior portion of the apartment building. The evidence made it apparent that Mr. Ramirez kept up his lethal pursuit until Juan Gallegos died. This was more than a momentary incident. The manner of shooting was sufficient to indicate premeditated intent.

### b. *Unlawful possession of a firearm*

Mr. Ramirez contends the evidence was insufficient to support his conviction for unlawful possession of a firearm because no firearm was ever recovered. We are unpersuaded. The State presented irrefutable evidence that the Gallegos brothers died from gunshot wounds. Mr. Ramirez was the person linked to both men's deaths. This

28

link was sufficient to establish that Mr. Ramirez must have possessed a firearm. The fact that the firearm was never recovered does not undercut the sufficiency of the State's proof.

### 2. *Hearsay testimony regarding Mr. Ramirez's use of the name Demon*

Mr. Ramirez claims the trial court erred in overruling his hearsay objection to Rosemary Valerio's testimony that Mr. Ramirez went by the name Demon. Although Ms. Valerio's testimony was hearsay and should have been excluded, this evidentiary error was harmless. Ms. Valerio's testimony was cumulative of other uncontested evidence that Mr. Ramirez used the nickname Demon. Such evidence included Angel Valerio's testimony, the testimony that Mr. Ramirez was in a law enforcement database of individuals named Demon, as well as the note in Arturo Gallegos's bedroom that contained the words "'nephew'" and "'Demon.'" 4 RP (Oct. 7, 2016) at 687.

### 3. *Prosecutorial misconduct during closing argument*

Mr. Ramirez argues the prosecutor committed misconduct in closing argument by arguing facts not in evidence regarding Juan Gallegos's suffering and Mr. Ramirez's thought processes. Because no objection was made to the prosecutor's comments at trial, Mr. Ramirez must establish that the prosecutor's comments were so flagrant and ill intentioned that they caused an enduring prejudice that could not be neutralized by a

29

curative instruction. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 165, 410 P.3d 1142

(2018). A prosecutor's misconduct in closing argument will only qualify as flagrant and

ill intentioned in a "narrow set of cases" raising concerns that a jury will draw "improper

influences from the evidence, such as those comments alluding to race or a defendant's

membership in a particular group, or where the prosecutor otherwise comments on the

evidence in an inflammatory manner." *Id*. at 170.

The portions of the prosecutor's argument at issue are as follows:

> Now . . . Juan probably opened up that bedroom door or maybe
> yelled from the other side, but Christopher Ramirez knew who Arturo lived
> with, so he shoots two times through the door. *That's not enough for him.*
> *He doesn't want any witnesses. He does want to get away with this*, after
> all, right? I mean, every sign that you've seen up until now, talking to
> Hritsco was stupid, but he was blocks away. Whoever would have thought
> that somebody would have heard him go over the chain-link fence and then
> a dog track and Carlton Hritsco could have still been outside when he was
> smoking another cigarette at the same time deputies came through. It was a
> really bad coincidence for Mr. Ramirez, right, for all of that to happen. He
> thought he was getting away with it.
>     And he didn't want Juan Gallegos to see him and be a witness either,
> so he shoots him two times through the door. And he probably can't give
> [sic] a good bead on him as he's going through the apartment, because it's
> so small and twisting and turning. But as soon as they get outside,
> Christopher Ramirez is right behind him, just right behind him. And Juan
> Gallegos doesn't stand a chance, because now Chris has line of sight and he
> has the gun. And he has a decision. Is it the first shot? Is it the second? Is
> it the third, the fourth, the fifth, sixth, seventh, eighth, the ninth, tenth? It's
> premeditation. It's cold. *It's coming up from behind somebody and putting*
> *so many bullets into them that the end of their life must have been*
> *absolutely miserable.*

30

> *Think about all those wounds that Juan Gallegos had. Think about what he felt like in the last 30 seconds, maybe?* That's premeditation.

6 RP (Oct. 13, 2016) at 1166-67 (emphasis added).

> Chances are [Juan] didn't know Christopher Ramirez was there . . . *because if [Juan] was in his bedroom and he hears a gunshot from Arturo's room, he's not going to open the door and see what Christopher Ramirez is doing in there. He's not knocking on the door to see what Christopher Ramirez is doing in there. He would have immediately gone for the front door.*
> Juan Gallegos didn't know Christopher Ramirez was there because he made the mistake of opening up that door to find out what had just happened in his brother's room. *And oh, dear God, it was Christopher Ramirez with a gun in his hand standing over the body of his brother.*

7 RP (Oct. 13, 2016) at 1195-96 (emphasis added).

To the extent the prosecutor's comments were improper, they do not rise to the level of flagrant and ill intentioned conduct that threatened Mr. Ramirez's right to a fair trial. The prosecutor's comments regarding Mr. Ramirez's thought processes were clearly designed to provide the jury a narrative of the State's theory of the case, based on inferences from the evidence. There was no apparent attempt to demean Mr. Ramirez or appeal to prejudice. *Cf. State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988) (evoking Wounded Knee and calling a Native American group to which the defendant was affiliated "'a group of madmen'" and "butchers"); *State v. Pierce*, 169 Wn. App. 533, 554, 280 P.3d 1158 (2012) (improper to attribute "repugnant and amoral thoughts" to the defendant). In addition, the prosecutor's reference to Juan Gallegos's end of life

31

misery was made in an attempt to argue that, by watching Juan Gallegos's prolonged

suffering, and yet continuing to deploy shots, Mr. Ramirez must have harbored

premeditation. While different wording might have been preferable, the prosecutor's

comments were neither prolonged nor overly emotive. *Cf. State v. Claflin*, 38 Wn. App.

847, 850, 690 P.2d 1186 (1984) ("[T]he use of a poem utilizing vivid and highly

inflammatory imagery in describing rape's emotional effect on its victims was nothing but

an appeal to the jury's passion and prejudice."); *Hawthorne v. United States*, 476 A.2d

164 (D.C. 1984) (reversal warranted when half of the prosecutor's closing argument was

delivered from the first-person perspective of the victim).

Had trial counsel been concerned that the prosecutor was appealing to the passions

of the jury, an objection could have been made, along with a request for a curative

instruction. Mr. Ramirez has not established that a curative instruction would have been

insufficient to offset any potential prejudice caused by the prosecutor's statements. Given

these circumstances, there is no reversible error.

### 4. *Testimony regarding the victims' human characteristics*

Mr. Ramirez argues the trial court abused its discretion in overruling his objection

to emotional testimony from Rosemary Valerio about what she missed most about her

father and uncle. Ms. Valerio testified that her father was "a funny guy, you know. He

liked life. He loved life. Always trying to find ways to make us laugh. He was always joking around." 3 RP (Oct. 6, 2016) at 440. Ms. Valerio described her uncle as "very kind-hearted and, you know, he was religious, strong believer in God, so he was always trying to get us to go to church . [sic] and every chance he got he would like preach to us, you could say, about God." *Id.* The prosecutor claimed Ms. Valerio's comments were relevant to show the Gallegos brothers were human, which was an element of the offense. The trial court permitted the testimony, simply noting the prosecution should be "judicious about it." *Id.*

We agree with Mr. Ramirez that it was improper for the prosecutor to elicit sympathetic traits about Arturo and Juan Gallegos. While the State was tasked with proving that both men were human, this was not an onerous task. Simply by identifying the Gallegos brothers as her father and uncle, Ms. Valerio established that the two men were human. This was further confirmed by the testimony of the State's medical examiners. Additional testimony regarding the sympathetic human traits of the Gallegos brothers was unnecessary to prove their status as humans and, given the potential for prejudice, should have been excluded under ER 403.

Although Ms. Valerio's testimony should have been excluded, there was no prejudice. *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)

33

(Nonconstitutional "error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected."). The State elicited Ms. Valerio's testimony shortly after the defense questioned Mr. Valerio about drug use by the Gallegos brothers and Arturo Gallegos's proclivity to associate himself with "tweaker girls" and multiple sex partners. 2 RP (Oct. 6, 2016) at 394-96. Although the trial court sustained multiple objections to the defense questioning, some questions were answered and the trial court permitted the introduction of evidence that the Gallegos brothers had methamphetamine in their systems at the time of death. The State voiced its concern that the defense was trying to attack the character of the two deceased men. Sympathetic testimony from Ms. Valerio appears to have merely offset the damaging character evidence suggested by the defense. It did not tip the scales toward an unjust trial or verdict.

### 5. Cumulative error

Mr. Ramirez contends that even if no single error in his case merits reversal, relief is warranted based on the cumulative effect of multiple errors. We disagree. Mr. Ramirez has identified only two errors during the trial process, both pertaining to Ms. Valerio's testimony. Neither error compounded the other. Thus, the combined force of the two errors does not warrant reversal.

*Alleged errors associated with sentencing*

### 1. *Aggravating circumstance not present in the information*

Mr. Ramirez argues that he did not receive notice of the aggravating circumstance, from RCW 10.95.020(10), that the jury was instructed on and found by special verdict. In the alternative, Mr. Ramirez contends the aggravating circumstance must be struck because alternative means were submitted to the jury even though they were not set forth in the charging document, and insufficient evidence supports each aggravating circumstance.

Mr. Ramirez cannot show prejudice from his alleged errors. Although Mr. Ramirez's information referenced aggravating circumstances and the question of aggravating circumstances was submitted to the jury, Mr. Ramirez did not receive an aggravated sentence. *See* RCW 10.95.030(1)-(2) (aggravated sentence would have been the death penalty or life without parole). He received standard range sentences under RCW 9.94A.589(1)(b). Accordingly, even if there had been a problem with notice or the State's manner of proof, there was no impact on the outcome of Mr. Ramirez's case.

### 2. *Concurrent sentences*

Mr. Ramirez argues that because the trial court failed to recognize it had discretion to impose a mitigated concurrent sentence under RCW 9.94A.535 and instead believed it

was required to impose consecutive sentences under RCW 9.94A.589(1)(b), this matter should be remanded for resentencing to allow the court to consider a mitigated concurrent sentence.

Mr. Ramirez is correct that, despite statutory language to the contrary, a sentencing judge has discretion to run multiple sentences for serious violent offenses concurrently as an exceptional sentence. *In re Pers. Restraint of Mulholland*, 161 Wn.2d 322, 329-31, 166 P.3d 677 (2007). However, Mr. Ramirez has not shown he was prejudiced by any mistaken belief that concurrent sentences were unavailable. While the trial judge recognized the significance of imposing a sentence on Mr. Ramirez and allowed Mr. Ramirez to allocute on the issue of leniency, the court never expressed any misgivings about imposing consecutive sentences or Mr. Ramirez's overall sentence length. To the contrary, the court imposed high end sentences for each of the two murder counts, something it would not have done had it thought consecutive sentences excessive. Because the record does not contain any possible indication that the trial court would have imposed concurrent sentences had it been alerted of the ability to do so, resentencing is unwarranted. *Id*. at 334; *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017).

No. 34872-5-III
*State v. Ramirez*

*Statement of Additional Grounds for Review*

Mr. Ramirez claims the prosecutor committed misconduct in opening statement by misstating the facts of the case. While it is true that some of the trial testimony differed from what was outlined in opening statement, Mr. Ramirez has not shown that the prosecutor knowingly misrepresented the evidence. Instead, it simply appears that the witnesses testified differently than anticipated. This did not amount to misconduct. In fact, it provided Mr. Ramirez fodder for attacking the State's case in closing argument. The prosecutor's opening statement does not provide grounds for reversing Mr. Ramirez's conviction.

## CONCLUSION

The judgment and sentence is affirmed.

Pennell, A.C.J.

WE CONCUR:

Siddoway, J.          Fearing, J.

37