**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2807-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAQUEL GARAJAU,

    Defendant-Appellant.

_____

Argued April 12, 2021 – Decided May 4, 2021

Before Judges Fasciale and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-11-1630.

Patricia B. Quelch argued the cause for appellant (Helmer, Conley & Kasselman, P.A., attorneys; Patricia B. Quelch, of counsel and on the brief).

Carey J. Huff argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Carey J. Huff, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After a twenty-four-day jury trial at which at least thirty-four witnesses testified, defendant appeals from her sixteen convictions stemming from her role in the death of the victim, who was shot during a robbery committed by her co-defendant boyfriend, Joseph Villani.[1]  The judge granted defendant's Reyes[2] motion dismissing the remaining counts.[3]  The State had alleged that defendant

---

[1]  She appeals from the following convictions: second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1 (count three); first-degree robbery, N.J.S.A. 2C:15-1 (count four); first-degree felony murder, N.J.S.A. 2C:11-3(a) (count five); third-degree conspiracy to commit theft of marijuana, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:20-3(a) (count six); third-degree theft of marijuana, contrary to N.J.S.A. 2C:20-3(a) (count seven); third-degree conspiracy to commit theft of cash and/or Movado watch, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:20-3(a) (count eight as to theft and theft of cash); third-degree theft of cash and/or Movado watch, N.J.S.A. 2C:20-3(a) (count nine as to theft and theft of cash); second-degree conspiracy to possess a weapon for an unlawful purpose, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:39-4(a)(1) (count ten); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count eleven); third-degree conspiracy to distribute marijuana, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5(b)(11) (count fourteen); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1) (counts sixteen, seventeen, and eighteen); third-degree hindering the apprehension of oneself, N.J.S.A. 2C:29-3(b) (count nineteen); third-degree hindering the apprehension of another, N.J.S.A. 2C:29-3(a) (count twenty-one); and third-degree tampering with a witness or informant, N.J.S.A. 2C:28-5(a) (counts twenty-two).

[2]  State v. Reyes, 50 N.J. 454 (1967).

[3]  First-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1) and (2) (count one); first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count two); third-degree conspiracy to commit theft of cash and/or

2

and her boyfriend conspired to rob and murder the victim, someone they had known, then dispose of the body. The judge sentenced defendant to an aggregate prison term of thirty-three years with thirty years of parole ineligibility.[4]

On appeal, defendant argues:

POINT I

THE [JUDGE] IMPROPERLY ADMITTED HEARSAY EVIDENCE DURING THE TRIAL.

A. Statement by a Party Opponent.

B. Statement in Furtherance of a Conspiracy.

C. State of Mind.

POINT II

THE TRIAL [JUDGE] ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AS TO COUNTS 3, 4, 5, 7, 8, 9, 10, 11,

---

Movado watch, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:20-3(a) (count eight pertaining to the Movado watch); third-degree theft of cash and/or Movado watch, N.J.S.A. 2C:20-3(a) (count nine pertaining to the Movado watch); second-degree conspiracy to disturb human remains, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:22-1(a)(1) (count twelve); second-degree disturbing human remains, N.J.S.A. 2C:22-1(a) (count thirteen); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1) (counts fifteen).

[4] After the appropriate mergers, the sentencing judge imposed a thirty-year prison sentence with thirty years of parole ineligibility for the murder; a three-year consecutive prison term for witness tampering; concurrent eighteen-month prison terms for witness tampering; and then concurrent prison terms of either eighteen months or three years for the rest of the convictions.

14, 16, 17, 18, 19, 21 AND 22 OF THE INDICTMENT AND IN DENYING DEFENDANT'S . . . MOTION FOR A JUDGMENT NOT WITHSTANDING THE VERDICT.

POINT III

THE JURY INSTRUCTIONS WERE INCORRECT, MISLEADING AND CONFUSING RESULTING IN A [CONCOMITANT] ERROR ON THE VERDICT SHEET AND BOTH REQUIRE REVERSAL OF DEFENDANT'S CONVICTION.

POINT IV

THE TRIAL [JUDGE] ERRED IN DENYING DEFENDANT'S MOTION FOR A FULL INQUIRY OF THE JURY AS TO WHETHER JUROR MISCONDUCT JURY DELIBERATIONS, REQUIRING A NEW TRIAL, OR A REMAND TO CONDUCT A FULL HEARING.

POINT V

THE [JUDGE] ERRED BY DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.

POINT VI

THE [JUDGE] ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT.

A. Prosecutorial Misconduct

B. Grand Juror Bias.

4

POINT VII

THE [JUDGE] ERRED BY DENYING DEFENDANT'S MOTION TO SEVER COUNTS OF THE SUPERSEDING INDICTMENT FOR TRIAL.

POINT VIII

THE [JUDGE] ERRED IN PERMITTING THE STATE'S WITNESSES TO BE QUALIFIED AND TESTIFY AS EXPERTS.

POINT IX

THE [JUDGE] ERRED BY DENYING DEFENDANT'S MOTION FOR A CHANGE OF TRIAL VENUE.

POINT X

DEFENDANT IS ENTITLED TO A NEW TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

POINT XI

DEFENDANT IS ENTITLED TO A NEW TRIAL DUE TO CUMULATIVE TRIAL ERRORS.

I.

We begin by addressing defendant's contentions that the judge made numerous erroneous hearsay rulings, which pertained to statements by a party opponent, N.J.R.E. 803(b)(1), statements by a co-conspirator, N.J.R.E. 803(b)(5), and statements indicative of state of mind, N.J.R.E. 803(c)(3).

A-2807-18

A trial judge's evidentiary rulings "are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial [judge's] discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). We will not "set such rulings aside unless it appears that 'there has been a clear error of judgment.'" Ibid. (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)). Stated differently, this court "must be convinced that 'the trial [judge's] ruling is so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting J.A.C., 210 N.J. at 295).

A.

The State introduced into evidence text messages written by defendant about the events leading to the charges. The judge correctly admitted those text messages under N.J.R.E. 803(b)(1). Defendant's evidentiary arguments on appeal, however, mostly pertain to out-of-court statements by other declarants, such as Villani, Niko Kacandes, Tyler Yuhas, John Michael Grier, and Thaissa Borges. As to these individuals, their statements were either introduced under N.J.R.E. 803(b)(5) or N.J.R.E. 803(c)(3).

B.

The co-conspirator exception to the hearsay rule provides that a statement may be admissible against a party if the statement is "made at the time the party-opponent and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan." N.J.R.E. 803(b)(5). "The rationale for the co-conspirator exception is that 'because conspirators are substantively liable for the acts of their co-conspirators, they are equally responsible for statements by their confederates to further the unlawful plan.'" State v. Savage, 172 N.J. 374, 402 (2002) (quoting State v. Harris, 298 N.J. Super. 478, 487 (App. Div. 1997)). Applying this exception to the hearsay rule, we see no abuse of discretion.

Any scheme to avoid apprehension and prosecution continues a conspiracy beyond the actual commission of its objective. State v. Soto, 340 N.J. Super. 47, 65 (App. Div. 2001) (holding a statement made after a crime was over was in furtherance of the conspiracy to evade capture), overruled on other grounds, State v. Dalziel, 182 N.J. 494 (2005); State v. Cherry, 289 N.J. Super. 503, 523 (App. Div. 1995) (holding statements by co-conspirator to establish a plan to prevent detection of himself and, in turn, the defendant furthered the conspiracy). Statements concerning "past events may be admissible if they are

7

'in furtherance' of the conspiracy and 'serve some current purpose, such as to provide cohesiveness, provide reassurances to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy.'" Savage, 172 N.J. at 403 (quoting State v. Taccetta, 301 N.J. Super. 227, 253 (App. Div. 1997)).

To qualify for admission under the co-conspirator exception, three conditions must be met: "(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be 'evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.'" Id. at 402 (quoting State v. Phelps, 96 N.J. 500, 509-10 (1984)).

### Kacandes's Testimony

Kacandes testified about a conversation he had with defendant and Villani where defendant was alleged to have said: "You should have heard how hard he hit the ground." Defendant maintains that this statement was "not made in furtherance of the conspiracy to commit armed robbery," "made after that conspiracy ended and [was] not made with the purpose to further any conspiracy," and "not made to create an alibi, to conceal evidence, to hinder

8                                                                 A-2807-18

apprehension, or to recruit Kacandes to participate in the conspiracy," and thus, the judge arguably erred by allowing into evidence the testimony.

Here, the purported purpose of defendant and Villani's conversation with Kacandes was to provide reassurance and to ensure his silence. Kacandes was aware of what happened earlier in the day with David Ardizzone, who was asked by Villani to move the car, and Anthony Eugenio, who left with Ardizzone from the garage after Ardizzone moved the car, and felt uneasy about the situation. In fact, aside from Kacandes's testimony, there was evidence that defendant texted Villani, "[Kacandes is] freaking out on me." By telling Kacandes that they just "robbed [the victim] for pot and money" and that he was "coming back soon to pick up his car," they were reassuring Kacandes that the person they had robbed was still alive.

<u>Phone Calls Between Yuhas and Villani</u>

Defendant argues the judge erred by admitting into evidence the calls between Yuhas and Villani as statements in furtherance of a conspiracy because defendant contends the "substance of those conversations was between Villani and Yuhas."

"The principal question in the 'in furtherance' issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy."

9                                                         A-2807-18

United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989). "[S]tatements may be found to be 'in furtherance' of the conspiracy . . . if they 'prompt the listener to respond in a way that facilitates the carrying out of criminal activity.'" Ibid. (quoting United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987)).

Yuhas's conversations with Villani were made in furtherance of the conspiracy to rob the victim and conceal the murder. Villani was trying to convince Yuhas that the car he had moved was not connected to the victim whatsoever and urged him to stay quiet. Defendant claims that the substance of the conversations was between Yuhas and Villani, but there was evidence that she was present for every phone call and, at one point, even got on the phone to speak with Yuhas herself.

### Text Message Conversation Between Villani and Grier

Defendant argues that the judge erred by admitting into evidence the text messages between Villani and Grier. Specifically, the texts that were exchanged when Grier inquired about purchasing marijuana from Villani, and then later met with Villani and defendant to make the purchase. However, these texts were made in furtherance of defendant and Villani's conspiracy to distribute marijuana, were made during the course of the conspiracy to distribute

marijuana, and there was independent evidence, aside from those particular text messages, of the existence of the conspiracy and defendant's relationship to it. Indeed, defendant was present when the sale of marijuana occurred.

## Borges's Testimony

Defendant argues that the judge erred by admitting into evidence Borges's testimony about a conversation between Villani and the victim that occurred over the phone and a conversation between Villani and Eric Geller at Geller's house. But Borges did not testify as to the substance of the conversation between Villani and the victim; only that it happened. As for the conversation between Villani and Geller at Geller's house, Borges only testified that the result of the conversation was that Geller would be attending dinner at the Brick House Tavern. Therefore, this testimony was not hearsay and no exception was necessary for it to be admitted.

## Text Message Conversation Between Villani and Defendant

Defendant argues the judge erred by admitting into evidence text messages exchanged between defendant and Villani regarding the rifle, as that evidence "did not fit within the co-conspirator hearsay exception" because "[t]he damaging information [came] from Villani, not defendant, and her responses reveal she was not involved in Villani's possession or use of the rifle." The

A-2807-18

exception, however, does not require that the statements sought to be admitted come from the defendant only, and thus there was no error in admitting Villani's text messages. Additionally, there was independent evidence, aside from these text messages, of the existence of the conspiracy to rob the victim and defendant's relationship to it. In any event, defendant did not object to this testimony at the time, and defense counsel emphasized the content of these text messages during summation. Even if it was error to admit these messages— which is not the case—it was invited. State v. A.R., 213 N.J. 542, 561-62 (2013).

As to state of mind, defendant argues that the judge erred by admitting into evidence Kacandes's testimony about his conversation with Villani regarding Villani's plan to rob someone. This evidence was not admissible under N.J.R.E. 803(c)(3). But the error was not "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2; State v. Castagna, 187 N.J. 293, 312 (2006). Prior to those statements being admitted into evidence, Kacandes testified:

> Q: And tell us what happened when you saw the defendant and Mr. Villani at your house the night of February 5th.
>
> A: Well, they were really happy because the Patriots won the game so both were in a very good mood. They

came over to my house. I was looking to get some pot that night, and [defendant] told me don't buy any tonight because Villani was planning on robbing somebody tomorrow.

. . . .

Q: And you had indicated that when they came to your house, you first had a discussion with [defendant]. Is that right?

A: Right.

Q: And just tell us again what she told you that night.

A: Well, I was looking to buy some pot that night, and she told me not to buy any that night because [Villani] was planning on robbing somebody the following day and he could get me a better price for it.

Q: And was . . . Villani present for that conversation?

A: Not currently at that conversation. It was just me and [defendant].

Kacandes testified that when Villani joined the conversation, defendant stayed and sat "right next to [Villani]." Kacandes testified that Villani only spoke about what he was intending to do, not what defendant was intending to do. Consequently, even if the judge erred by admitting Kacandes's testimony regarding statements made by Villani, the error was not clearly capable of producing an unjust result, as defendant herself had made similar statements only seconds prior and was present throughout the entire conversation.

13

II.

We reject defendant's contentions that the judge erred by denying her motion for judgment of acquittal, and that the judge erred by denying her motion for judgment notwithstanding the verdict.

## Judgment of Acquittal

Under Rule 3:18-1, a defendant is entitled to a judgment of acquittal at the close of the State's case "if the evidence is insufficient to warrant a conviction." The test is "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014). The evidence can be direct or circumstantial, Reyes, 50 N.J. at 459, and "[i]nferences need not be established beyond a reasonable doubt," State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011). We review the record de novo to assess whether the State presented sufficient evidence to defeat a motion for a judgment of acquittal. State v. Dekowski, 218 N.J. 596, 608 (2014).

The judge denied defendant's motion for judgment of acquittal as to counts three, four, five, six, seven, ten, eleven, fourteen, nineteen, twenty-one, and twenty-two. The judge granted in part and denied in part defendant's motion for

14

judgment of acquittal on counts eight and nine; specifically, the judge granted the motion for the judgment of acquittal of the portion that charged defendant with conspiracy to commit theft of the watch and denied the portion that charged defendant with conspiracy to commit theft of cash and theft of cash.

As to the robbery counts, the State provided proofs which included: (1) testimony from Kacandes about conversations that occurred on February 5, 2017 with defendant and Villani about a plan to rob an individual; (2) multiple text messages that were sent between defendant and Villani regarding a rifle, and specifically, a text sent by defendant to Villani, which said "[y]ou need to clean the bullets;" (3) attendance records, which showed that defendant did not attend class on February 6, 2017; (4) cell phone records, which showed that defendant was in the area of Villani's home around the time of the robbery and murder; (5) testimony from multiple witnesses regarding the amount of marijuana Villani had in his possession after February 6, 2017, and the amount of cash he had available after that date; and (6) testimony from the medical examiner and Brandon Wobser that the victim was shot three times—once in the chest and twice in the head. Based on this evidence, a reasonable jury could find defendant guilty of conspiracy to commit armed robbery and robbery. These same proofs also supported the felony murder count.

15

As to the theft of marijuana counts, in addition to the proofs mentioned above, the State's proofs also included: (1) testimony from Borges regarding a meeting on January 12, 2017 that Villani had with the victim, and defendant's knowledge of that meeting; (2) text messages between defendant and Villani where the two complained of needing money; (3) text messages sent from defendant and Villani's cell phones that indicated that they sold marijuana in order to make money; (4) testimony from Kacandes regarding a conversation he had with defendant and Villani on February 6, 2017, where defendant and Villani told him that they successfully robbed someone of about a half a pound of marijuana and $2000; and (5) testimony from Borges about seeing defendant and Villani with a large bag of marijuana on February 8, 2017. Thus, the judge was correct not to dismiss these counts because a reasonable jury could find defendant guilty of conspiracy to commit theft of marijuana and theft of marijuana.

As to the portions of count eight and nine that the judge did not dismiss, conspiracy to commit theft of cash and theft of cash, in addition to the proofs listed above, the State's proofs also included: (1) Villani's bank statements, which showed a cash deposit into his account on February 13, 2017; (2) a surveillance video of that transaction, which showed defendant at the bank with

16

Villani; (3) several purchases defendant and Villani made after February 6, 2017, such as the ring from Pandora and the PlayStation video game console; and (4) Wobser's testimony that he was given $300 cash after helping Villani dump the victim's body in the river. The judge found a reasonable jury could find defendant guilty of conspiracy to commit theft of cash and theft of cash.

As to the weapon possession counts, once again, the State's proofs included text messages between defendant and Villani regarding a rifle. Of significance was a text sent by defendant to Villani that said, "[y]ou need to clean the bullets." Additionally, the State's proofs included: (1) the murder weapon, a .22 Long Rifle Caliber Marlin Semi-Automatic Rifle, which was found in Villani's home; (2) bullet casings, which were found in Villani's garage and bedroom; and (3) YouTube videos found on Villani's computer that were accessed two weeks prior to the victim's murder regarding loading, cleaning, and shooting the rifle. A reasonable jury could find defendant guilty of possession of a weapon for an unlawful purpose.

As to the conspiracy to distribute marijuana count, the State's proofs included text messages where defendant offered to sell marijuana. Additionally, Kacandes testified that he paid defendant for marijuana on February 5, 2017, and Borges testified that on February 8, 2017, she saw a large bag of marijuana

in Villani's vehicle. A reasonable jury could find defendant guilty of conspiracy to distribute marijuana.

Defendant did not move below for a judgment of acquittal on counts sixteen, seventeen, and eighteen, which were three counts alleging tampering with physical evidence. Regardless, as to these counts, the State's proofs included text messages between defendant and Villani regarding cleaning up the scene and disposing of evidence. Defendant instructed Villani to use "bleach." She also instructed Villani to toss the victim's cell phone in the ocean and to move the victim's vehicle before it was noticed. A jury could reasonably find defendant guilty of tampering with physical evidence, and thus, defendant was not entitled to a judgment of acquittal on these counts.

As to the hindering counts, the State's proofs included text messages from defendant to Villani, in which defendant instructed Villani on how to destroy evidence. Significantly, defendant instructed Villani to "CLEAN THAT FUCKING CAR TO[-]FUCKING[-]DAY." A reasonable jury could find defendant guilty of hindering apprehension of oneself and hindering apprehension of another based on the evidence presented by the State.

As to the witness tampering count, in addition to the texts from defendant to Villani instructing him to clean, the State's proofs also included recordings of

telephone calls between Yuhas and Villani, in which defendant can be heard in the background telling Yuhas not to implicate himself and not to say anything to police. A reasonable jury could find defendant guilty of witness tampering.

As for the conspiracy counts, defendant contends that "[t]here is no direct evidence of defendant's participation in a conspiracy to commit armed robbery or acting as an accomplice to felony murder or the weapons charges." Defendant maintains that "[t]he entirety of the State's case rests on the inferences to be drawn from the facts presented." As explained above, however, the State need not present only direct evidence. Reyes, 50 N.J. at 459. The evidence may be circumstantial, and the jury is permitted to draw inferences from that evidence. Williams, 218 N.J. at 294. As discussed above, the State presented multiple pieces of evidence suggesting that defendant and Villani had entered a conspiracy to rob the victim of marijuana and cash, and thus, the judge correctly denied defendant's motion for a judgment of acquittal on those counts.

Defendant further argues that there was no direct evidence that she acted as Villani's accomplice. However, once again, direct evidence is not required. Reyes, 50 N.J. at 459. The State presented multiple pieces of evidence suggesting that defendant did act as Villani's accomplice, and therefore, the

19

judge correctly denied defendant's motion for a judgment of acquittal on those counts as well.

In sum, after considering all the evidence, the judge did not err in permitting counts three, four, five, six, seven, eight, nine, ten, eleven, fourteen, sixteen, seventeen, eighteen, nineteen, twenty-one, and twenty-two be presented to the jury for consideration.

Motion for a New Trial

In the alternative, defendant argues that the judge erred in denying her motion for a new trial, as the verdict was against the weight of the evidence. A jury verdict shall not be set aside by a judge as against the weight of the evidence unless "it clearly and convincingly appears that there was a manifest denial of justice under the law." R. 3:20-1. A manifest denial of justice occurs when a "verdict was the result of mistake, partiality, prejudice or passion." Reyes, 50 N.J. at 463-64. In instances where a judge has already determined that defendant is not entitled to an acquittal at the close of the State's case, there is no manifest denial of justice when the judge subsequently refuses to set aside the jury's verdict under Rule 3:20-1. State v. Perez, 177 N.J. 540, 555 (2003). The judge's ruling shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law. R. 2:10-1. There was sufficient evidence to support

the jury's verdict. Thus, no manifest denial of justice occurred in this case warranting a new trial.

III.

Defendant contends that the judge gave an improper jury instruction on armed robbery and felony murder and that the purported error was compounded by the wording of the verdict sheet. Defendant argues a specific unanimity charge on armed robbery was required to uphold the felony murder conviction.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). "Entailed is a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Id. at 287-88. Because defendant did not object to the portion of the jury charge in question, we review the jury charge for plain error. State v. McKinney, 223 N.J. 475, 494 (2015). Plain error is error that is "clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2). An unjust result arises when the error raises a "reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]" State v. Taffaro, 195 N.J. 442, 454 (2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Failure to object creates a "presum[ption] that the instructions were adequate." State v. Morais, 359 N.J. Super. 123, 134-35 (App.

Div. 2003). "When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)).

Here, the judge followed the model jury charge and correctly charged the jury on count three, second-degree conspiracy to commit robbery, count four, first-degree robbery, and count five, first-degree felony murder. The record shows that the judge specifically charged the jury that "[t]he verdict must represent the considered judgment of each juror and must be unanimous as to the charge."

As to count four, the judge correctly charged the jury with the model jury charge on accomplice liability as well as co-conspirator liability. Indeed, if the facts support liability as an accomplice or a co-conspirator, each theory supported by the facts should be charged to the jury, and the jury need not agree on the basis for liability to convict the defendant of the substantive crime. State v. Roach, 146 N.J. 208, 223 (1996) (noting that "[w]hen a defendant may be found guilty either as a principal actor or as an accomplice, the jury should be instructed about both possibilities"). Therefore, not only was the jury charge correct, but so was the verdict sheet, especially considering that the jury's

finding of guilt based on one theory of liability or another did not affect gradation of the offense or sentencing.  Ibid.; see also State v. Diaz, 144 N.J. 628, 643-45 (1996) (providing examples of when special verdict sheets should be used).

Contrary to defendant's argument, liability for substantive crimes committed by co-conspirators is distinguishable from liability for conspiracy to commit those same crimes.  Compare N.J.S.A. 2C:5-2 with N.J.S.A. 2C:2-6(b)(4).  A person may be convicted of conspiracy to commit a crime only if he or she intended to promote or facilitate the commission of that crime.  N.J.S.A. 2C:5-2.  Liability as a co-conspirator for the substantive crime is significantly broader.  State v. Roldan, 314 N.J. Super. 173, 188 (App. Div. 1998).  Thus, it was not misleading or confusing for the judge to instruct the jury on co-conspirator liability, as it pertained to count four, in addition to conspiracy to commit a crime, as it pertained to count three.

As for the felony murder count, the jury finding of guilt must be for the felony itself based on a charge of liability, such as co-conspirator liability or accomplice liability; a jury finding of guilt for conspiracy to commit that felony does not suffice.  State v. Grey, 147 N.J. 4, 15-18 (1996).  Here, the judge was correct to instruct the jury that it could not convict defendant of felony murder

unless it convicted her of count four, armed robbery. The judge specifically told the jury that guilt as to conspiracy to commit armed robbery was not enough.

Moreover, the judge's response to the jury's question, "May we please have layperson definitions of conspiracy, co-conspirator and accomplice?" was appropriate. The judge explained to the jury that it was to use the legal definitions already provided. See State v. Parsons, 270 N.J. Super. 213, 221 (App. Div. 1994) (explaining that "if the jurors ask to be reminded of a definition . . . the judge may simply repeat the appropriate portion of the instructions"). Jury instructions must define terms consistent with "the sense in which the Legislature used the term." State v. N.I., 349 N.J. Super. 299, 308-10 (App. Div. 2002). Thus, the judge's response was not error. Moreover, defense counsel did not object to the judge's response, creating a presumption that the response was adequate, Morais, 359 N.J. Super. at 134-35, and the jury did not send out any more questions, further "demonstrat[ing] that the response was satisfactory," State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991).

Defendant further argues that the judge should have instructed the jury that Kacandes, Yuhas, and Greier were cooperating witnesses. Defendant maintains that the judge's failure to do so "rendered the jury charge misleading and was an incorrect legal conclusion." We disagree.

Although the judge did not instruct the jury that Kacandes, Yuhas, and Greier were cooperating witnesses, he did instruct the jury that Wobser was a cooperating witness, as he helped Villani dispose of the victim's body, signed a cooperation agreement with the State, and testified at defendant's trial under an order that granted him immunity.  Because defense counsel asked for the charge as to Kacandes, Yuhas, and Greier, which the judge denied, we review the judge's decision for harmless error.  State v. Baum, 224 N.J. 147, 159 (2016).  Under this standard of review, there must be some real possibility that the purported error led the jury to a verdict it might not have reached.  Ibid.

It is long-established that "a defendant has a right, upon request, to a specific jury instruction 'that the evidence of an accomplice is to be carefully scrutinized and assessed in the context of his [or her] specific interest in the proceeding.'"  State v. Adams, 194 N.J. 186, 207 (2008) (quoting State v. Spruill, 16 N.J. 73, 80 (1954)).  The purpose of the cooperating witness charge is to "caution the jury 'regarding the credibility of witnesses who may have a special interest in the outcome of the cause, which might lead to influencing their testimony[.]'"  Id. at 208 (quoting State v. Begyn, 34 N.J. 35, 54 (1961)).  "This special interest comes about by reason of hope, or even bargain, for favor in later prosecution treatment of the witness' own criminal conduct in return for

aid in convicting the defendant." Begyn, 34 N.J. at 54. Thus, the cooperating charge provides:

> The law requires that the testimony of such a witness be given careful scrutiny. In weighing his/her testimony, therefore, you may consider whether he/she has a special interest in the outcome of the case and whether his/her testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feelings of revenge or reprisal.
>
> [Model Jury Charge (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (Feb. 6, 2006).]

Defendant asserts that Kacandes "was on probation and his violations of the terms of his probation were not reported to his probation officer." As for Yuhas and Grier, defendant asserts that they admitted to their use and distribution of marijuana, but "were not charged in connection with their admissions." Defendant maintains that those three witnesses had a "special interest" in testifying for the State, requiring the judge to give the jury the cooperating witness charge.

Contrary to her arguments, however, these witnesses had no reason to seek any favor from the State that would give them any "special interest" in the outcome of the trial or influence their testimony. First, the evidence showed that Kacandes and Grier bought and used marijuana with defendant and Villani in January and February 2017. By the time of their testimony in defendant's trial

in 2018, they had not been charged with any offenses and the statute of limitations for those crime had passed.  N.J.S.A. 2C:35-10(a)(4); N.J.S.A. 2C:1-6(b)(2).  As for Yuhas, the evidence showed that he unknowingly moved the victim's car, and he voluntarily came forward when he discovered what he had done.  Therefore, he could not have been charged because did not possess the requisite mental state to commit any offense as to the car.  N.J.S.A. 2C:2-2(a).

Although Kacandes was on probation when he spoke to law enforcement, that matter was resolved before defendant's trial, and its resolution was disclosed to defendant and the jury, and defendant cross-examined Kacandes for bias. Additional testimony revealed that law enforcement did not promise Kacandes anything in exchange for information regarding defendant.  Thus, we see no error in declining to give a cooperating witness charge for Kacandes, Yuhas, and Grier.  But even if there was, the error was harmless, as the judge properly instructed the jury on assessing the credibility of the witnesses generally, which provides, among other things, that the jury may take into consideration "the witness' interest in the outcome of the trial" and "the possible bias, if any, in favor of the side for whom which the witness testified."  Therefore, there is no real possibility that the absence of a specific cooperating witness charge as to Kacandes, Yuhas, and Grier led the jury to a verdict it might not have reached,

27

as defense counsel argued that these witnesses were biased, and the judge told the jury that it may take that into consideration.

IV.

Defendant argues that jury misconduct occurred during deliberations and that the judge failed to sufficiently ascertain whether such was the case. And she contends that evidence of the purported misconduct was "newly discovered evidence."

Juror number three, who was an alternate, emailed defense counsel asking to speak together. Defense counsel advised that he could not discuss the case, and he encouraged the juror to reach out to the judge if the juror believed there "to be any question . . . as to the fairness or integrity of the proceedings." Defense counsel further advised the juror that he would notify the court of their communications. Under Rule 1:16-1, defense counsel then filed a notice of motion for comprehensive juror inquiry. The judge received an email from juror number three, stating: "I believe that [defendant] did not receive a fair and impartial trial by fair and impartial jurors." Following a hearing with counsel, the judge advised that he would order juror number three to appear in court to question the juror on the record and in the presence of counsel. The following colloquy occurred:

28

Judge:  I want to hear from you what it was.

Juror three: There was -- many jurors would often talk about media accounts of the trial with -- during the trial.  There have -- there are multiple -- there were times when certain jurors would say guilty on all counts prior to the conclusion of the proceedings, the charging of the jury, prior to deliberations.

Judge:  And specifically what date did this occur?

Juror three:  I do not recall which day.

. . . .

Juror three: I would say maybe some time in August they would exclaim, guilty on all charges.

. . . .

Juror three: Jurors stated that they would spend longer in deliberations in order to waste your time, Your Honor, and the time of the attorneys just like, and I quote, "they wasted their time."

. . . .

Judge:  And why didn't you bring this to my attention sooner?

Juror three: Because I was terrified of -- at the start of the trial my -- my son was only eight months old, and these people on the jury know where I live, they know where I work.  It's very easy to find my contact

29

information, because I work for [a public organization], and my boss' information.

Judge:   And may I assume that you disagree with the jury's verdict?

Juror three:  Not -- not entirely.

.  .  .  .

Judge:   [Juror three], I don't know what, if any, solace my comments have given to you.  This is not the type of case where you need to be concerned for yourself, your loved ones, your job.  It's just not that type of case.  So, with that, I hope this gives you some peace of mind.  If there's any -- anything else at this point?

Juror three:  There's one specific thing that came to mind that was said, but one of the -- one of the jurors, like, I'd have to count the chairs to see which one, once found an article dating the [F]all of 2017 talking about text messages between somebody by the name of . . . Geller and something about planning a robbery and he showed this article to other jurors.  I think that's one -- that's the last thing I had forgotten from.

Judge:   So, specifically, again, I'm going to ask you from July 17th, 2018, when we first started our journey together, to when the final verdict was returned on September 12th, 2018, can you tell me when that happened?

Juror three: I would say upon our return from our recess after -- in August, like we had those two

30

weeks. It was right after we returned from that.

Judge: That Tuesday?

Juror three: I don't know if it was exactly that day. I believe, to the best of my knowledge, that it was after we returned from our two week recess.

Judge: And you say it was that week, the following week?

Juror three: I don't remember. Sorry.

Following the juror's testimony, the judge then heard oral argument on defendant's motion for a comprehensive juror inquiry. The judge then denied the request in a written decision. He found that juror number three's testimony was "hesitant, uncertain, and provided little specificity regarding juror [number three's] alleged observations." The judge did not find juror number three's claim that she "was terrified" of the other jurors credible, as it did not "comport with [the judge's] observations of the jury throughout the course of [the] lengthy trial." Indeed, the judge found that the "jurors appeared to be harmonious, respectful and cordial to one another." He also noted that there was "ample opportunity" for juror number three to bring her concerns about the fairness or the integrity of the proceedings to the judge's attention, but she ultimately did not. Because juror number three, who was an alternate juror, indicated that

31

"[they] agreed in part and disagreed in part with the jury's verdict," the judge concluded that "[c]learly, although having never participated in deliberations, juror [number three] disagreed with the verdict." Thus, based on those observations, in addition to juror number three's lack of specificity, the judge found that the defendant failed to establish good cause to conduct a more comprehensive juror inquiry under Rule 1:16-1.

Whether there was good cause to permit the post-trial interrogation of jurors pursuant to Rule 1:16-1 is a question of law which we review de novo. State v. Griffin, 449 N.J. Super. 13, 18-19 (App. Div. 2017). However, deference is given to the factual findings of a judge when that judge has made their findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial. State v. Hubbard, 222 N.J. 249, 269 (2015).

Rule 1:16-1 provides that "[e]xcept by leave of court granted on good cause shown, no attorney or party shall . . . interview, examine, or question any . . . juror with respect to any matter relating to the case." Post-verdict juror inquiry is an "'extraordinary procedure,' to be utilized 'only upon a strong showing that a litigant may have been harmed by jury misconduct.'" Griffin, 449 N.J. Super. at 19 (quoting Davis v. Husain, 220 N.J. 270, 279 (2014)).

Generally, a jury's verdict should not be disturbed because of what a juror may have said during deliberations; however, our Supreme Court has recognized two exceptions that would constitute "good cause" under Rule 1:16-1 to call back discharged jurors for questioning: "[F]irst, where a juror 'informs or misinforms his or her colleagues in the jury room about the facts of the case based on his [or her] personal knowledge of facts not in evidence' and second, where racial or religious bigotry is manifest in deliberations." Griffin, 449 N.J. Super. at 21 (citing State v. Koedatich, 112 N.J. 225, 288 (1988)). A "bald accusation" that jurors considered extraneous information or some outside influence tainted the jury is not enough to reconvene a jury that convicted a defendant. State v. Harris, 181 N.J. 391, 503-04 (2004).

The judge correctly found that "good cause" did not exist in this instance, warranting further questioning. First, although the juror testified that other jurors discussed articles about the case during trial, the juror could not specify which jurors had those discussions nor when those discussions occurred. The juror also could not recall exactly what those articles were about. Second, although juror number three testified that some jurors announced their verdict prior to deliberations and some jurors said they would delay issuing a final verdict so as to waste time, the juror also could not recall what jurors made those

comments or when they occurred. Importantly, juror number three was not part of the final deliberations.

The judge's finding that juror number three was not credible is supported by the record and is therefore entitled to deference. Hubbard, 222 N.J. at 269. For example, juror number three claimed they were terrified of their fellow jurors, but no other similar complaints were lodged throughout the entire trial. The judge noted that he observed the jurors to at all times be "harmonious, respectful, and cordial." Juror number three stated that some jurors said they would delay issuing a final verdict so as to waste time, but the jury deliberated for two-and-a-half days, which was not an inordinate amount of time given the voluminous evidence presented in this case.

Finally, after the judge issued his written decision, he correctly denied defendant's motion for a new trial based on "newly discovered evidence," which defendant maintains amounted to the representations of juror misconduct given by juror number three. In denying defendant's motion for a new trial, the judge found:

> [T]he basis for defendant's motion is not "newly-discovered evidence." The nature of the information the juror provided is not material to any issue in the case or to the defendant's defense that she did not conspire with . . . Villani to rob [the victim]. The information is not evidence that would have probably

change[d] the jury's verdict. Moreover, credibility and importance of newly-discovered information was discussed and summarily rejected by this [c]ourt in its December 10, 2018 opinion.

Of note, particular note, the juror in question that this [c]ourt did, in fact, . . . question was an alternate juror . . . . I did not find her allegations to be credible. I found certain, in terms of her veracity, I made some findings with regard to that. This was an alternate juror who candidly told this [c]ourt under oath that she disagreed with the verdict. Having said that, and for the reasons previously placed on this record, I will deny the motion for a new trial on newly-discovered evidence.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).

A motion for a new trial based on newly discovered evidence may be made at any time. R. 3:20-2. Where a defendant seeks a new trial "premised on the discovery of 'new' evidence, the evidence must be: (1) material to the issue and not merely cumulative, impeaching or contradictory; (2) discovered after the trial and not reasonably discoverable prior thereto; and (3) of a nature as to

probably have affected the jury's verdict." Armour, 446 N.J. Super. at 312 (citing State v. Carter, 85 N.J. 300, 314 (1981)).

Juror number three's representations did not constitute newly-discovered evidence warranting a new trial. First, and most importantly, the judge found that the information provided by juror number three was not credible. Second, even if the information provided was credible, it was not material to any issue that arose in defendant's case and therefore would not have affected the jury's verdict. Finally, the information provided was not timely. The conduct identified by juror number three as being troublesome occurred prior to deliberations, and although the juror could have notified the judge of her concerns at an earlier point in time, she did not. In fact, juror number three did not contact anyone associated with the case until approximately six weeks after the jury rendered their final verdict.

V.

An earlier judge did not err by denying defendant's motion to dismiss the superseding indictment. That judge concluded that the superseding indictment controlled and dismissed the previous indictment. Thereafter, the case was transferred to the trial judge for trial. Defendant renewed her motions to dismiss

the superseding indictment, arguing prosecutorial vindictiveness as well as the presence of grand juror bias, which the trial judge denied.

The trial judge issued a written opinion and order denying defendants' renewed motion. As to the issue of prosecutorial vindictiveness, the judge found that there was nothing in the record to support defendant and Villani's contention that the State sought a superseding indictment in "retaliation" for "defendants' asserting a constitutional right." As to the issue of grand juror bias, the judge found that the prosecutor "followed proper procedure to ensure the integrity of the grand jury," and consequently found "nothing" in the record to suggest the presence of bias or interest. We review the judge's order denying defendant's motion for an abuse of discretion. State v. Twiggs, 233 N.J. 513, 544 (2018).

Prosecutorial Vindictiveness

"The essence of the concept of prosecutorial vindictiveness is a violation of due process by retaliating against a defendant for exercising a legal right." State v. Gomez, 341 N.J. Super. 560, 571 (App. Div. 2001). "[A]lthough there is an opportunity for prosecutorial vindictiveness in the pretrial stage, it is insufficient to justify a presumption of vindictiveness for the pretrial action of adding or substituting charges." Id. at 574. The reason for this is because "[t]rial preparation or continuing investigation may well lead the prosecutor to the

reasonable conclusion that additional or substituted charges are appropriate." Id. at 575. Thus, the issue is not whether a prosecutor sought or obtained additional charges after a defendant sought or asserted a right prior to trial, but "whether [a] prosecutor's action was solely retaliation against defendant for the exercise of a legal right." Ibid.

Before a jury is empaneled, prosecutors have broad discretion to file additional charges. State v. Zembreski, 445 N.J. Super. 412, 426 (App. Div. 2016). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." Gomez, 341 N.J. Super. at 573 (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).

Here, the superseding indictment was returned prior to a jury being empaneled. The additional charges, which were the conspiracy charges and the distribution of marijuana charge, were based on probable cause and did not significantly increase defendant's potential sentencing exposure because most of the new charges were lesser-included offenses of charges contained in the previous indictment. Even if there was additional sentencing exposure,

however, there is no vindictiveness if, for example, the prosecutor believed that the case was undercharged. Gomez, 341 N.J. Super. at 566.

Regardless, defendant maintains that "[a]n objective review of the entire sequence of [pretrial] events leads to the conclusion that the State was dissatisfied with [the earlier judge's] rulings on the [N.J.R.E. 404(b)] evidence sought to be introduced," and that that dissatisfaction precipitated the State's decision to seek and obtain a superseding indictment. But, even if that were the case, that does not constitute prosecutorial vindictiveness because that is not evidence that the State retaliated against defendant for exercising a legal right. Gomez, 341 N.J. Super. at 571. All that shows is that the "purpose of the government . . . was to overcome the . . . objection to the introduction of the [evidence]." United States v. Krezdorn, 718 F.2d 1360, 1365 (5th Cir. 1983). Indeed, the State filed the N.J.R.E. 404(b) motion, prompting the earlier judge's decision, not defendant. By responding to the State's motion, the only right defendant exerted was her "right not to be convicted . . . based on improper evidence." Ibid. The State's decision to re-indict defendant was not based on any actions she took, and therefore, there is no evidence of prosecutorial vindictiveness.

## Grand Juror Bias

Next, defendant argues that there was "a colorable basis for finding potential bias" in grand jury proceedings, given "[t]he fact that three of the jurors were familiar with the case through the prior media exposure," and consequently, the issue should have been brought to the Assignment Judge (AJ) and not handled by the prosecutor. At the Grand Jury proceedings, the prosecutor stated:

> You may have heard about this case, because it has received some press coverage. Has anybody heard about the case? I see a couple of hands. If you have heard about the case I need you to understand that charges are just that, charges. It is for you, as Grand Jurors, to determine whether probable cause exists for any or all of the charges that are before you. You need to understand that despite charges or what anybody may say in the news, individuals are innocent until proven guilty even if a grand jury finds probable cause.
>
> You also need to understand that what you [may] read in the news may or may not even be accurate as to the particular facts of a case. You need to decide this case and make your decision on these charges based solely on what you hear in this room today. Can everybody follow those instructions?
>
> Okay. Those people I think there were two or three people that may have read an article about this in the

Press. Can you all follow that instruction? Okay. All the Grand Jurors are indicating yes. Anybody -- anybody that cannot follow that instruction? Okay. There are no hands. Can everybody be fair and impartial and let the evidence guide your determination given those instructions? Everybody is indicating yes. Okay.

Under Rule 3:6-3(a):

> When appropriate, the [AJ] shall inquire of potential grand jurors about such aspects of their background as may reveal possible bias or interest in a matter to come before the grand jury. The [AJ] shall instruct the grand jury that without the Assignment Judge's approval no grand juror shall participate in any matter in which that juror has a bias or a financial, proprietary, or personal interest; and if that juror wishes to participate, the juror shall forthwith so inform the prosecutor. The prosecutor shall forthwith inform the [AJ], who shall determine, in camera, whether such bias or interest exists and whether it justifies excusal.

In State v. Murphy, 110 N.J. 20, 33, 36 (1988) (internal citations omitted), the Supreme Court set out the general procedure to be followed when addressing the question of possible bias on the part of a grand juror, as well as the consequence that may result if the procedure is not followed:

> We believe that a prosecuting attorney has the obligation not only to note the existence of possible prejudice or bias on the part of a grand juror but to disclose such circumstances to the court and to afford the court the opportunity to preserve the impartiality of the grand jury proceedings. Accordingly, we now hold that, as an officer of the court, the prosecuting attorney

41

has a responsibility to bring to the attention of the presiding judge any evidence of partiality or bias that could affect the impartial deliberations of a grand juror. We hold further that upon such a disclosure the court should determine whether such partiality or bias exists and whether it justifies excusal of the grand juror from the particular case being considered or from the panel.

. . . .

In the future . . . we shall require that violation of such procedures by a prosecuting attorney in the face of evidence of grand juror bias or partiality, will result in dismissal of an indictment prior to trial.

Here, the prosecutor followed the procedure outlined in Murphy and interviewed the grand jurors to detect any possible bias or lack of impartiality. Although "a couple" jurors indicated that they had "heard about the case," all of those jurors also indicated that they could be "fair and impartial, and let the evidence guide" their determinations, and thus, there was no need for the prosecutor to bring the matter to the attention of the AJ. See State v. Biegenwald, 106 N.J. 13, 35 (1987) (noting that "pervasive pretrial publicity does not necessarily preclude the likelihood of an impartial jury").

Importantly, Rule 3:6-3(a) explains the procedure to be used "when appropriate." "The rule does not require that the [AJ] must interrogate personally every potential grand juror who may have a bias in a particular case." State v. Land, 376 N.J. Super. 289, 292 (App. Div. 2005). Only in those

42

instances where a prosecutor has information "which supports a legitimate and colorable basis for believing that a grand juror lacks impartiality" must a prosecutor inform the AJ. State v. Hogan, 336 N.J. Super. 319, 350 (App. Div. 2001).

Here, the prosecutor was not required to alert the AJ because she made proper inquiries of the jurors who indicated that they had heard of the case before and ensured that they could be fair and impartial. The record shows that the jurors did not show any potential for personal or individualized bias, and therefore, there was no legitimate basis to bring them before the AJ.

VI.

The judge properly exercised his discretion in denying defendant's motions to sever counts of the superseding indictment, particularly, count fourteen, charging conspiracy to distribute marijuana.

In denying these motions, the judge entered an order and written decision. He found that counts one, three, six, seven, eight, nine, ten, and twelve were lesser-included charges of charges that were contained in the original indictment, and therefore, severance of those counts was not appropriate. As to count fourteen, conspiracy to distribute marijuana, the judge found that while this charge was not a lesser-included charge of one from the prior indictment, it

43

still "stem[med] from the same events charged in the original indictment," and therefore, its severance was inappropriate. As to counts fifteen and sixteen, tampering of physical evidence, he found that severance was not appropriate because "they are inextricably intertwined with the remaining counts of the indictment. Defendants tampered with evidence after the murder of [the victim], and therefore these counts are interconnected."

Rule 3:7-6 provides that "[t]wo or more offenses may be charged in the same indictment . . . if the offenses charged . . . are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." However, under Rule 3:15-2(b), "[i]f for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment or accusation the court may order an election or separate trials of counts . . . or direct other appropriate relief." When the offenses charged are the same or similar, based on the same transactions, or of a common plan or scheme, joint trials are preferable in the interest of judicial economy, to avoid inconsistent verdicts, and allow for a "more accurate assessment of relative culpability." State v. Weaver, 219 N.J. 131, 148 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)).

A-2807-18

A judge's decision regarding a motion to sever is reviewed for an abuse of discretion. State v. Chenique-Puey, 145 N.J. 334, 341 (1996). Whether severance is warranted depends on whether prejudice is present. State v. Sterling, 215 N.J. 65, 73 (2013).

First, the conspiracy counts, that is, the lesser-included offenses, were properly joined with their substantive offenses. "[N]o meaningful constitutional distinction exists between a charged lesser offense and a lesser-included offense for which there exists a rational basis in the evidence. A defendant charged with a greater offense is on notice that he may be convicted of a lesser-included offense." State v. Ruiz, 399 N.J. Super. 86, 104 (App. Div. 2008).

As for count fourteen, conspiracy to distribute marijuana, this was also properly joined, as evidence showed that defendant and Villani planned to rob and murder the victim to take his marijuana distribution business as their own. Weaver, 219 N.J. at 148. "Separate conspiracies which are necessarily part of a larger common goal . . . can be joined, because participation of others is implicit in that type of crime." State v. Kropke, 123 N.J. Super. 413, 418 (Law Div. 1973). As for counts fifteen and sixteen, tampering with physical evidence, these were also properly joined because they were part of defendant and Villani's

common plan or scheme to rob and murder the victim, take his marijuana distribution business as their own, and avoid apprehension.

## VII.

Defendant argues the judge erroneously qualified certain witnesses to testify as experts.

### Cell Site Analysis/Gladiator Autonomous Receiver

Pretrial, defendant argued that the State's proffered expert in cell site analysis, Farid Salehroa, should not be permitted to testify because there was "nothing" in his reports that spoke "of the reliability of the mechanisms that he used in conducting this analysis." Following argument, the judge denied defendant's request to exclude the expert testimony of Salehroa. To the extent defendant may have requested a Frye[5] hearing, the judge denied that as well.[6]

The parties agree that defendant did not file a motion requesting the judge conduct a Frye hearing regarding the Gladiator Autonomous Receiver (Gladiator) used to conduct cell site analysis. This was the case even after the judge explained that "if in fact we're going to need a Frye type of motion[,] that

[5] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

[6] Defendant did not file a motion for leave to appeal.

needs to be requested in writing to the extent that it can be briefed in advance, that needs to be done." It is not the judge's obligation to sua sponte conduct a Frye hearing, and "[i]f a party opposes expert testimony on the ground that the field has not obtained general acceptance, that party should raise that issue at trial." State v. McGuire, 419 N.J. Super. 88, 129 (App. Div. 2011). We therefore decline to consider this issue. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). However, we add the following remarks.

At trial, Salehroa testified that one of the devices he used to conduct his cell site analysis was a Gladiator. He testified that he was "familiar" with the device, was "certified to use" it, and in fact, used the device "throughout [his] career." In addition, Salehroa testified that he taught other law enforcement agencies how to use the Gladiator.

N.J.R.E. 702 governs the admission of expert testimony. The rule provides that "[i]f scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To satisfy the rule,

> the proponent of expert evidence must establish three things: (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's

A-2807-18

testimony could be sufficiently reliable"; and (3) "the witness must have sufficient expertise to offer the" testimony.

[State v. Pickett, ___ N.J. Super. ___ (App. Div. 2021) (slip. op. at 40) (quoting State v. J.G.L., 234 N.J. 265, 280 (2018)).]

As for the second prong, in criminal cases, our courts have continued to rely on the Frye standard to assess reliability. Pickett, ___ N.J. Super. ___ (slip op. at 41). The test "requires trial judges to determine whether the particular science underlying the proposed expert testimony has 'gained general acceptance in the particular field in which it belongs.'" Pickett, ___ N.J. Super. ___ (slip op. at 41) (quoting Frye, 293 F. at 1014).

There are "three ways to establish general acceptance under Frye: expert testimony, authoritative scientific and legal writings, and judicial opinions." Pickett, ___ N.J. Super. ___ (slip op. at 41) (quoting J.L.G., 234 N.J. at 281). "Although we look for wide support within the relevant scientific community, complete agreement is not required for evidence to be admitted." Pickett, ___ N.J. Super. ___ (slip op. at 41) (quoting J.L.G., 234 N.J. at 281).

As to the first method, a witness qualifies as an expert if there is evidence of the required "experience, training or education." State v. Moore, 122 N.J. 420, 458 (1991). The proffered expert "must 'be suitably qualified and

possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion.'" Id. at 458-59 (alteration in original) (quoting State v. Odom, 116 N.J. 65, 71 (1989)).

The second method of proving general acceptability is reliance on authoritative literature. While the number of positive articles in scientific publications is a reliable indicator of acceptance in the scientific community, no particular minimum need be produced. State v. Harvey, 151 N.J. 117, 174 (1997). Additionally, "[u]nder appropriate circumstances, speeches, addresses, and other similar sources may be used to demonstrate the acceptance of a premise by the scientific community." Ibid. (quoting State v. Kelly, 97 N.J. 178, 211 n.17 (1984)).

As to the third method, a scientific theory may be accepted based on its high profile in judicial opinions. See, e.g., State v. Torres, 183 N.J. 554, 569-71 (2005) (relying on judicial decisions alone to admit expert testimony on gangs). However, a reviewing court will generally not determine general acceptance on the basis of judicial notice alone. State v. Doriguzzi, 334 N.J. Super. 530, 539 (App. Div. 2000).

"Whether expert testimony is sufficiently reliable to be admissible under N.J.R.E. 702 is a legal question [we] review de novo." J.L.G., 234 N.J. at 301.

"When reviewing a decision on the admission of scientific evidence, [we] should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature." Harvey, 151 N.J. at 167.

On appeal, defendant argues that Salehroa should not have been permitted to testify regarding the results of his cell site analysis because "there was no proffer as to the accuracy of the [Gladiator device]" that he utilized. Defendant maintains that she is "not aware of any studies evaluating the accuracy of Gladiator's equipment and software" nor could she find "any decisions in either state or federal courts recognizing the software as scientifically reliable."

Contrary to defendant's argument, Salehroa testified that in his training and experience, the Gladiator is an accepted and widely-employed device used to conduct cell site analysis. Additionally, although there are no published opinions in this State squarely addressing the accuracy of the Gladiator device, there are several out-of-state and federal precedents that discuss the admissibility of cell site data analysis generally, and those precedents agree that the cell site data analysis methodology is reliable and admissible. Carpenter v. United States, ___ U.S. ___, 138 S. Ct. 2206, 2211-12 (2018); United States v. Hill, 818 F.3d 289, 297 (7th Cir. 2016); United States v. Reynolds, 626 Fed. App'x. 610, 616-17 (6th Cir. 2015); United States v. Schaffer, 439 Fed. App'x

344, 347 (5th Cir. 2011); <u>United States v. Weathers</u>, 169 F.3d 336, 339 (6th Cir. 1999); <u>United States v. Jones</u>, 918 F. Supp. 2d 1, 5 (D.D.C. 2013); <u>United States v. Evans</u>, 892 F. Supp. 2d 949, 955-56 (N.D. Ill. 2012); <u>State v. DePaula</u>, 166 A.3d 1085, 1097-99 (N.H. 2017); <u>State v. Johnson</u>, 797 S.E.2d 557, 563 (W.Va. 2017); <u>Pullin v. State</u>, 534 S.E.2d 69, 71 (Ga. 2000); <u>Wilson v. State</u>, 195 S.W.3d 193, 200-02 (Tex. Crim. App. 2006). Therefore, this court may also judicially notice the reliability of cell site data analysis methods and the devices used to gather such data, such as the Gladiator. <u>See</u> <u>State v. Ramirez</u>, 425 P.3d 534, 544 (Wash. Ct. App. 2018) (finding that "[t]he theories behind the drive-through test/cell tower strength testimony were sound. It is not novel or uncommon to measure the strength of cell tower or radio frequencies").

In addition, Salehroa was adequately questioned, both during direct and cross-examinations, regarding the limitations inherent in cell site data analysis, including its limitation of providing only a general area in which a cell phone could be located. Thus, even if it was error to permit his testimony, it was harmless because the jury was advised that the cell site data analysis did not necessarily prove anything.

## Cellbrite and AXIOM

Defendant argues for the first time on appeal that "there was no testimony on the scientific reliability of Cellbrite used by a detective to download data from cellphones" and, similarly, there was no testimony on the scientific reliability of AXIOM, which had been used "to examine Villani's laptop." In addition, defendant argues that "[t]here has been no judicial recognition of Cellbrite or AXIOM as being scientifically reliable by any state or federal court." Thus, for those reasons, defendant argues that it was error to allow testimony regarding these programs and their results. We choose not to consider this unsupported argument as it was not raised before the trial judge below. See State v. Witt, 223 N.J. 409, 419 (2015) (noting that "[f]or sound jurisprudential reasons, with few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial [judge] when an opportunity for such a presentation is available'" (quoting State v. Robinson, 200 N.J. 1, 20 (2009))).

We note, however, that expert testimony is not needed to explain to a jury what was forensically discovered on a cell phone or laptop computer. State v. Miller, 449 N.J. Super. 460, 471 (App. Div. 2017), rev'd on other grounds, 237 N.J. 15 (2019). As the judge explained to the jury during defendant's trial,

Cellebrite is a forensic tool that extracts data from a device, in this case, defendant and Villani's cell phones. It decodes and allocates the data into a chronological report that can be easily read. Likewise, AXIOM is a forensic tool that extracts data from a device, in this case, Villani's laptop. Thus, even if defendant properly raised the issue, we see no plain error. See R. 2:10-2.

## Blood Stain Analysis

Finally, defendant argues that the judge abused his discretion by allowing expert testimony, given by Detective Sergeant Ryan Muller, on blood stain analysis. She asserts that the State "failed to establish a true need for expert testimony in this area and the detective's qualifications did not meet the standard for testifying as an expert." According to defendant, "[t]he jury could recognize a bloodstain caused by a drip as compared to one that was caused by dragging a bloody object or a smear caused by an attempt to clean up the blood."

When considering proffered expert testimony, the trial judge exercises discretion in determining "[t]he necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony[.]" State v. Zola, 112 N.J. 384, 414 (1988). An expert must "be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion." State v. Cain, 224 N.J. 410, 426 (2016).

"The qualifications of an expert and the admissibility of opinion or similar expert testimony are matters left to the discretion of the trial [judge]." McGuire, 419 N.J. Super. at 123 (citing Torres, 183 N.J. at 572).

Here, the judge did not abuse his discretion by permitting Muller to testify as an expert, as the State showed that he had certain skills, knowledge, or training. Muller testified that he had worked at the Monmouth County Prosecutor's Office for twelve years and had analyzed "over 1,000 crime scenes" during his career. In his role as a crime scene detective, he photographically documents scenes, processes scenes for latent fingerprints, conducts bloodstain pattern analysis, collects other biological evidence, and performs firearms identification. He testified that he has taken multiple classes in crime scene analysis, including classes in bloodstain pattern analysis, and that he also teaches classes in crime scene analysis.

It is of no moment that Muller was never previously qualified as an expert in blood stain analysis. A proffered witness is not disqualified merely because he or she has not previously been qualified as an expert in his or her chosen field. State v. Frost, 242 N.J. Super. 601, 616-17 (App. Div. 1990). Relatively limited training in a subject may qualify an expert to testify regarding it. See, e.g., Torres, 183 N.J. at 572 (police officer's on-the-job training in gang activity

qualified him to present expert testimony on the organization and structure of gangs); <u>Moore</u>, 122 N.J. at 457-60 (a State trooper who had been a crime scene investigator for two years but had received only two days of training in blood-splatter analysis was nonetheless qualified as an expert in blood-splatter analysis).

In addition, the judge did not abuse his discretion in permitting Muller to testify as an expert on bloodstain analysis because, contrary to defendant's assertions, bloodstain analysis is not a subject matter within the ken of the average juror, and therefore, expert testimony would "likely aid rather than bewilder the jury." <u>Moore</u>, 122 N.J. at 459.

In any event, the judge instructed the jury:

> You are not bound by such expert's opinion but you should consider each opinion and give it the weight to which you deem it is entitled, whether that be great or slight, or you may reject it.
>
> In examining each opinion, you may consider the reasons given for it if any, and you may also consider the qualifications and credibility of the expert. It is always within the special function of the jury to determine whether the facts on which the answer or testimony of an expert is based actually exists. The value or weight of the opinion of the expert is dependent upon and is no stronger than the facts on which it is based.

VIII.

Defendant argues that the AJ erred by denying her motion for a change of trial venue. Pretrial, defendants moved for a change of venue under Rule 3:14-2. We review defendant's argument under an abuse of discretion standard. State v. Nelson, 173 N.J. 417, 476-77 (2002).

In support of their motion, defendant and Villani argued that "the publicity" concerning their case had created a "presumption of prejudice and thus change of venue [was] appropriate." They presented twenty-four articles, the majority of which were from the Asbury Park Press and NJ.com, and offered eighty-four comments made by anonymous readers on NJ.com.

In denying the motions, the AJ issued a written opinion and order. She found that the majority of the comments made by anonymous readers on NJ.com were "not particularly inflammatory and did not support defendants' claim of 'extreme community hostility' towards the defendants." The AJ noted that visitors to NJ.com may be residents across the state or throughout the country, and therefore, she could not "draw any conclusions that these comments were made by residents who may compose the Monmouth County jury pool." In any event, the AJ noted that Monmouth County's population was 625,846 as of July 1, 2016, and thus, the eighty-four comments, even if they all were made by

Monmouth County residents, represented significantly less than one percent of the county's population.

The AJ also found that "the nature of the coverage" was "consistent with what would be expected for a homicide case," and defendants "failed to provide any evidence" that the press reported only those facts favorable to the State. She noted that "there have been no editorials demonizing defendants as monsters or making pronouncements of their 'death worthiness.'" She denied defendant's motions without prejudice, stating that "defendant[] may renew the motion if jury selection reveals actual prejudice, so pervasive that it threatens [her] right to a fair trial." Neither defendant renewed the motion.

Rule 3:14-2 requires a change of venue where the judge "finds that a fair and impartial trial cannot otherwise be had." For example, a change of venue may be granted to "overcome the realistic likelihood of prejudice from pretrial publicity." State v. Williams, 93 N.J. 39, 67 n.13 (1983). In determining whether to transfer venue because of pretrial publicity, a judge must account for the distinction "between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual

A-2807-18

effect of the publicity on the impartiality of the jury panel." Biegenwald, 106 N.J. at 33 (citations omitted).

"Cases in which prejudice is presumed are 'relatively rare and arise out of the most extreme circumstances.'" Nelson, 173 N.J. at 475 (quoting Koedatich, 112 N.J. at 269). Our Court has defined "presumptively prejudicial publicity" as "a torrent of publicity that creates a carnival-like setting" or "a barrage of inflammatory reporting that may but need not include all of the following: evidence that would be inadmissible at the trial, editorial opinions on guilt or innocence, and media pronouncements on the death-worthiness of a defendant." Ibid. (quoting State v. Harris, 156 N.J. 122, 143, 147-48 (1998)). Judges should consider the following factors in determining whether presumed prejudice exists:

> (1) evidence of extreme community hostility against defendant; (2) prominence of either the victim or defendant within the community; (3) the nature and extent of news coverage; (4) the size of the community; (5) the nature and gravity of the offense; and (6) the temporal proximity of the news coverage to the trial.
>
> [Id. at 476 (citing Koedatich, 112 N.J. at 282-84).]

Our Court presumed prejudice, for example, in Harris. 156 N.J. at 147-48. In that case, a newspaper conducted a "vengeance seeking crusade" against the defendant and referred to him as "Satan in Disguise," "a beast," "human trash,"

and a "monster." Ibid. The United States Supreme Court presumed prejudice in Rideau v. Louisiana, 373 U.S. 723, 727 (1963), where the defendant's uncounseled jailhouse confession was taped without his knowledge or consent and broadcast on local television to an audience of between 24,000 and 53,000 viewers.

Here, defendant argues that the AJ abused her discretion in denying her and Villani's pretrial motion for a change of venue because they both received extensive "negative publicity." Defendant maintains that she was clearly prejudiced by this publicity, as the testimony provided by juror number three revealed that jurors discussed articles "both before and during deliberations." But contrary to defendant's assertions, there was no evidence of extensive "negative publicity," and thus, the AJ did not abuse her discretion. Of all the articles presented by defendants, none were opinion pieces. All were recitations of facts and other information presented in court. None were hostile or inflammatory. See Nelson, 173 N.J. at 475; Harris, 156 N.J. at 147-48. In any event, as noted by the AJ, Monmouth County's population near the time of defendant's trial was over 600,000, and therefore, the jury pool was large enough to allow the for-cause excusal of jurors who may have read any articles and allowed them to effect their judgment. See State v. Williams, 113 N.J. 393, 429

(1988) (indicating "[t]otal ignorance of the case . . . is not a necessary prerequisite to serving as a juror. A juror may still serve if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court" (citations omitted)).

As for juror number three, her post-trial testimony does not support defendant's argument that pretrial publicity was presumptively prejudicial. Again, even if a sitting juror had read any articles prior to being empaneled, that is acceptable so long as he or she can set aside his or her impression or opinion and render a verdict based on evidence in court. Ibid. Juror number three's testimony, which the judge did not believe, does not support defendant's argument that the impartiality of the jury panel was affected because of any articles published pretrial. The juror could not specify what articles were read, which jurors discussed those articles, or when those discussions occurred. Moreover, juror number three did not deliberate, and therefore, had no knowledge of what was discussed during deliberations.

IX.

We reject defendant's argument that the assistant prosecutor committed prosecutorial misconduct.

Opening statements by prosecutors "'should provide an outline or roadmap of the State's case' and 'should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence.'" State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (quoting State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004)). Generally, a prosecutor is afforded broad latitude in making the opening statement. See State v. Cherry, 289 N.J. Super. 503, 527 (App. Div. 1995) (noting that "[a] prosecutor's opening statement, for example, may introduce a wide range of permissible evidence to establish motive"). We will consider improper remarks made by the prosecutor in the context of the opening as a whole and will not be grounds for reversal, particularly if unobjected to, as long as they did not deprive defendant of a fair trial. State v. Roman, 382 N.J. Super. 44, 57-58, 61 (App. Div. 2005). In other words, "to warrant a new trial, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury failure evaluate the merits of his [or her] defense." State v. Wakefield, 190 N.J. 397, 438 (2007); see also R. 2:10-2 (stating that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an

unjust result, but the appellate court may . . . notice plain error not brought to [its] attention").

Here, defendant claims that it was misconduct for the prosecutor to open with, "the best way to get away with murder is with a smile." Defendant also argues that it was misconduct for the prosecutor to have referenced text messages sent between defendant and Villani, and a conversation between defendant and Kacandes. Finally, defendant contends the assistant prosecutor improperly ended her opening by pointing to the following statements:

> At the beginning of my opening statement I told you that the best way to get away with murder is with a smile. Who do you think said that? This girl. The defendant said that. She said that to . . . Villani [fifteen] days after [the victim] was shot and killed. So at the conclusion of this case, when it comes time to make your ultimate decision on defendant's guilt or innocence, I am confident that you will not let her get away with murder.

Defendant claims that these comments demonstrate that the prosecutor "went too far in her opening," as she "commented on evidence that might not be admitted" and "mischaracterized evidence concerning the comment about murder with a smile." Defendant further claims that the prosecutor "implied that if the jury did not find the defendant guilty, it would not be fulfilling its duty," which is "most egregious."

A-2807-18

When considering the prosecutor's opening as a whole, none of the comments cited by defendant, whether considered individually or in the aggregate were so egregious as to warrant a new trial.

First, as to the prosecutor's mention of the text message containing the phrase, "the best way to get away with murder is with a smile," that evidence was not mischaracterized because defendant made that statement in a text message on February 21, 2017, two weeks after the murder and the day before law enforcement discovered the victim's body. Given the timing of the message, reasonable minds could view the text message as inculpatory evidence even if there was other evidence presented that the text message was about something that had happened at defendant's workplace. Therefore, the prosecutor's comments regarding that text message were not improper, as they were fair comment on the evidence intended to be presented. Nevertheless, defense counsel did not object when this comment was made, strongly suggesting that this comment was not prejudicial. State v. Ramseur, 106 N.J. 123, 323 (1987).

As to the assistant prosecutor's comments regarding text messages exchanged between defendant and Villani and conversations between defendant and Kacandes, they were all general recitals of evidence the State expected, in good faith, to present at trial, and therefore were also not improper. Indeed, the

State presented multiple text message conversations between defendant and Villani. The State also presented Kacandes's testimony about the conversations he had with defendant both prior to and after the victim's murder. In her brief, defendant claims that at the time these comments were made, there was some question as to whether those pieces of evidence were admissible, and therefore, the prosecutor's comments regarding that evidence should have been stricken. Contrary to defendant's contentions, however, pretrial motions to suppress were had, and based on the outcomes of those motions, the State expected in good faith that the text messages and other conversations would be introduced. See State v. Carter, 54 N.J. 436, 450-51 (1969) (finding the State's opening statement was made in good faith). The prosecutor did not make an argument that was clearly contrary to information that was excluded from evidence. McGuire, 419 N.J. Super. at 144.

Finally, the prosecutor did not imply that if the jury did not find the defendant guilty, it would not be fulfilling its duty. Instead, the prosecutor stated that at the end of the trial, given the evidence the State intended to introduce, she was confident the jury would find defendant guilty. The prosecutor did not declare defendant guilty or say that the jury would not be doing its job if it did not find defendant guilty. The prosecutor simply invited

the jury to assess the weight and reliability of the evidence to come to a conclusion. Also, defense counsel did not object when this allegedly improper comment was made, strongly suggesting that it was not prejudicial.

<u>State's Closing</u>

Defendant further alleges that the prosecutor committed misconduct in her closing. Defendant cites to several comments which she argues, either individually or cumulatively, were "so egregious" that they "had the capacity to deprive [her] of a fair trial," and therefore she is "entitled to reversal or her convictions."

The prosecutor is ordinarily accorded considerable latitude to "sum up the State's case graphically and forcefully," <u>State v. Johnson</u>, 31 N.J. 489, 510-11 (1960), and to pursue these and other prosecutorial duties with earnest and vigor, <u>see</u> <u>State v. Ingram</u>, 196 N.J. 23, 43 (2008). Although prosecutors may use forceful language, they are not entitled "to cast unjustified aspersions on the defense." <u>State v. Acker</u>, 265 N.J. Super. 351, 356 (App. Div. 1993).

Defendant contends that the State's reference to "a fable of a wolf in sheep's clothing" was improper. But a review of the record shows that the prosecutor used this fable to respond to the arguments made in defense counsel's summation, which were that defendant was an innocent college student and did

not have any knowledge of Villani's plan to rob and shoot the victim. This fable has been used by prosecutors in many trials, and our courts have consistently found that the "wolf taking the lives of two helpless sheep" metaphor "d[oes] not violate the proscription against name-calling and simply does not rise to the level where defendant's right to a fair trial is implicated." Wakefield, 190 N.J. at 467.

Defendant contends that the prosecutor improperly characterized her as "cold and calculating" and "disparaged Villani's intelligence" by referencing a text Villani sent to defendant about him "pooping." Again, however, these comments were in direct response to defense counsel's arguments that defendant was an innocent college student who fell in love with the wrong man. The prosecutor argued that defendant was "not who she portrays herself to be. . . . She's cold. She's calculating. . . . She was . . . Villani's co-conspirator. She was his accomplice." The prosecutor then further commented that defendant and Villani would "communicate hundreds of times a day. . . . He literally would not poop without telling her about it." Thus, in context, the prosecutor's comments were fair considering defense counsel's arguments and the evidence presented in the record. The record shows that they were also brief and fleeting

in nature; consequently, they did not substantially prejudice defendant's right to a fair trial.

Next, defendant argues that the prosecutor improperly vouched for Kacandes's credibility. The record shows that the prosecutor only mentioned Kacandes's credibility because it was first discussed by defense counsel in his summation. The prosecutor said: "It was argued that [Kacandes's] credibility is . . . as low as it can possibly be. I submit to you, complete opposite. He testified against his best friend who he didn't have to implicate in anything. And he did because it's the truth." "A prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." Walden, 370 N.J. Super. at 560 (citing State v. Scherzer, 301 N.J. Super. 363, 445 (App. Div. 1997)). Although the prosecutor's comments may have come close to the line of permissible commentary, they were still responsive, and in the context of the entire closing, were brief and fleeting in nature and not significant enough to warrant reversal.

Defendant also claims that the prosecutor committed misconduct when she stated that defendant was at Villani's house when he shot the victim; a statement "in direct contradiction of the concession in the State's opening that

defendant was not present." However, a review of the record shows that the prosecutor did not state that defendant was at Villani's house when he shot the victim. Rather, the prosecutor said that defendant was with Villani "from about 2:23 p.m. to 3:37 p.m.," "the hour before [the victim] is robbed and killed." Thus, the prosecutor did not say anything that was in direct contradiction to the evidence.

Finally, defendant takes issue with the prosecutor's final comment: "Find her guilty on all counts. Because if you don't, she's already told you how she's walking out that door with a smile on her face." Defendant argues that it was improper for the prosecutor to allude to the text message defendant sent that said, "the best way to get away with murder is a smile" because there was "clear evidence" that this statement was not made in connection with the victim's death. As previously discussed, however, the text message was sent the day before the body was discovered and two weeks after the murder. Given the timing of the message, reasonable minds could view the text message as inculpatory evidence. Defense counsel was free to argue alternatively, and he did. Thus, there was nothing improper about the prosecutor arguing that this text was made in reference to the victim's death. And defense counsel did not object when any of

68

these allegedly improper remarks were made, strongly suggesting that these comments were not prejudicial.

"[E]ven when a prosecutor's remarks stray over the line of permissible commentary," reversal of a conviction is not automatically required. State v. McNeil-Thomas, 238 N.J. 256, 275 (2019). Rather, "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial" is weighed, and a conviction is reversed only if "the conduct was so egregious as to deprive defendant of a fair trial." Wakefield, 190 N.J. at 437 (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). See State v. Jackson, 211 N.J. 394, 408-09 (2012) (noting that "'[n]ot every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal") (quoting Williams, 113 N.J. at 452).

"Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" Jackson, 211 N.J. at 409 (alteration in original) (quoting Koedatich, 112 N.J. at 338). Importantly, a determination as to whether a prosecutor's comments had the capacity to deprive defendant of a fair trial must be made "within the context of the trial as a whole." State v. Feaster, 156 N.J. 1, 64 (1998).

Here, the prosecutor's remarks, even if found to be improper, were not so egregious as to deprive defendant of a fair trial. The evidence against defendant was overwhelming. The State presented text messages sent between defendant, Villani, and others regarding the distribution of marijuana and of the victim and testimony from multiple witnesses regarding defendant's involvement with the distribution of marijuana and the robbery.

Finally, in his jury charge the judge instructed, in accordance with the Model Jury Charges, that the "arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence." We presume juries follow instructions. State v. Loftin, 146 N.J. 295, 390 (1996).

Lastly, defendant contends that the cumulative effect of the purported trial errors undermined her rights to due process and a fair trial, warranting reversal of her conviction.

The cumulative effect of trial errors may merit reversal when it "casts doubt on the propriety of the jury verdict that was the product of that trial." State v. Jenewicz, 193 N.J. 440, 474 (2008). Reversal may be justified when the cumulative effect of a series of errors is harmful even if each error itself is harmless. Ibid. "[T]he predicate for relief for cumulative error must be that the

70

probable effect of the cumulative error was to render the underlying trial unfair."

Wakefield, 190 N.J. at 538.  Such is not the case here.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION